**KING RANCH, INC., et al.**

v.

**William Warren CHAPMAN, III, et al.**

**No. 01–0430.**

Supreme Court of Texas.

Argued April 2, 2003.

Decided Aug. 28, 2003.

Rehearing Denied Nov. 21, 2003.

Howard P. Newton, San Antonio, James H. Robichaux, Corpus Christi, Matthews & Branscomb, P.C., Mary Taylor Henderson, Office of the Attorney General, Leon Vadim Komkov, Baskin Bennett & Komkov, Carroll G. Martin, Scott Douglass & McConnico, Austin, Keith R. Verges, Mark T. Davenport, Figari Davenport & Graves, LLP, Dallas, Robert R. Sykes, The Law Office of Robert R. Sykes, Midland, J.W. Cooper, Jr., Cooper & Cooper, J.A. (Tony) Canales, Canales & Simonson, P.C., Russell H. McMains, Law Offices of Russell H. McMains, Corpus Christi, J. Scott Carothers, Andrews & Kurth, Gerri M. Fore, Exxon Company, U.S.A., John B. Thomas, Laura B. Rowe, Hicks Thomas & Lilienstern, LLP, Jess H. Hall, Jr., Stacy Lee Williams, Roland Garcia, Jr., Locke Liddell & Sapp LLP, Karen L. Chisholm, Zummo & Mitchell, L.L.P., Houston, Rick Foster, Porter Rogers Dahlman & Gordon, San Antonio, Mike A. Hatchell, Molly H. Hatchell, Hatchell P.C., Tyler, Edward J. Schroeder, The Law Office of Edward J. Schroeder, San Antonio, for petitioners.

John Blaise Gsanger, William R. Edwards, The Edwards Law Firm, L.L.P., Craig S. Smith, Law Office of Craig S. Smith, Michael G. Terry, Hartline Dacus Barger Dreyer & Kern, LLP, Donald B. Edwards, The Law Office of Donald B. Edwards, Corpus Christi, for respondent.

Justice JEFFERSON delivered the opinion of the Court.

Various heirs of Major William Warren Chapman and his wife, Helen Chapman, seek title to an undivided one-half interest

in 15,449.4 acres of property, much of it contained within the storied King Ranch in South Texas. The Chapman heirs allege that, in the late 1800s, their forebears' lawyer conspired with Captain Richard King to deprive the Chapman heirs of rightful title to the property. Seeking to avoid an 1883 agreed judgment, they have filed a bill of review and a trespass to try title action. For the reasons set forth below, we reject their claims.

# I

## Factual Background

### A. The Property

Roughly one hundred fifty years ago, the State of Texas issued a patent to the heirs of Juan Mendiola, conveying to them three-and-one-half leagues of land totaling 15,449.4 acres located in Nueces County. These lands were known as the Rincon de Santa Gertrudis. Today, the Rincon includes portions of the King Ranch, the City of Kingsville, and the Kingsville Naval Air Station.

In 1853, the Mendiola heirs transferred their interest in the Rincon to Captain Richard King. Later that year, King conveyed a one-half interest to Gideon Lewis. Three years later, in 1856, King conveyed half of his remaining half interest (*i.e.* a one-fourth interest) to Major William Warren Chapman, who is the Chapman heirs' ancestor and the source of the title they claim. Lewis died later that year. Hamilton Bee, his administrator, sold the Lewis interest in the Rincon back to King and Chapman jointly for $1,575, for which King gave his individual promissory note. Bee executed a deed accordingly (the "Lewis deed"). At that point, King and Chapman each owned a one-half undivided interest

in the property, although the Lewis deed was not recorded until 1904.

### B. Cause No. 1279

Major Chapman died testate in 1859, leaving his estate to his wife Helen. Twenty years later, in 1879, she sued King in trespass to try title. The suit, filed in the 25th district court of Nueces County, Texas and bearing Cause No. 1279, sought an undivided one-half interest in the Rincon as well as title to a separate 240 acre property. Helen Chapman alleged that King, her co-tenant, had ejected her from the Rincon on January 1, 1877. Mrs. Chapman was represented by two law firms: M. Campbell & Givens and Lackey & Stayton.[1] By 1881, attorney Robert Kleberg had joined the Lackey & Stayton firm and participated in the representation of Mrs. Chapman.

King, represented by F.E. Macmanus and Pat. O'Doeharty, answered the suit and admitted that the Lewis estate had conveyed Lewis's interest in the Rincon to King and Chapman jointly. King asserted, however, that he acquired title by reason of his exclusive, adverse possession of the Rincon from as early as 1857 and that Major Chapman did not pay for his interest under either the deed between King and Chapman or the Lewis deed. King asserted that Major Chapman verbally and, later, in a letter, surrendered his interest under both deeds to King in forgiveness of his debt for the purchase price, but that the letter was lost when the Union raided the King Ranch during the Civil War. King alleged that he paid the Lewis estate for Chapman's interest, took exclusive possession of the Rincon, took various actions to confirm his title, and "cultivated, used and enjoyed" the land for the three,

---

1. In 1881, then Governor Oran Roberts appointed J.W. Stayton associate justice of this Court. Seven years later, Governor Law- rence Sullivan Ross promoted Stayton to Chief Justice of this Court.

five, ten, and twenty-year statutory periods under the adverse possession statutes then in effect. *See* Act approved Feb. 5, 1841, 5th Cong., R.S., §§ 15–17, 1841 Repub. Tex. Laws 163, 167–68, *reprinted in* 2 H.P.N. GAMMEL, THE LAWS OF TEXAS 1822–1897, at 627, 631–32 (Austin, Gammel Book Co. 1898).

Helen, who by this time had moved to South Carolina, died in 1881 before the lawsuit concluded. She left her two children a life estate in her interest in the Rincon, and the remainder interest to her five grandchildren. Her will was probated in both South Carolina and Texas by John Rankin, a co-executor appointed by Mrs. Chapman.[2] Rankin was substituted as plaintiff in Cause No. 1279, but none of the heirs was named in or made a party to the case.

On April 7, 1883, four years after suit was filed and twenty-four years after Major Chapman's death, the parties settled Cause No. 1279, and the trial court rendered judgment accordingly. The April 7, 1883 judgment recited:

> [The Chapman Estate] is entitled to recover one half of the land sued for by the plaintiff ... but that in consideration of the moneyed judgment herein after set out and rendered in favor of the plaintiff and against the defendant Richard King—it is now here, by consent of all the parties hereto,—ordered adjudged and decreed by the Court—that all right title and interest of the said estate of Helen B. Chapman deceased in and to said grant originally made to Juan Mindeola [sic] be vested in Richard King the defendant herein, and that he be quieted in his possession of the said tract of land described in plaintiff's petition.... And it is now here further ordered adjudged and decreed that plaintiff do now have and recover from the defendant Richard King the sum of Five Thousand Eight Hundred and Eleven Dollars and Seventy Five Cents, $5,811.75 to be paid in four installments of one fourth (1/4) of said aggregate sum each said payments to be made respectively at the expiration of Six (6) months, Twelve (12) months, Eighteen (18) months and Twenty Four (24) months from this date on said aggregate sum at the rate of Ten (10) per centum until paid and should any default be made on the payments of said installments and the interest thereon accrued if any there be, then execution shall at once issue for the entire sum remaining unpaid of said whole amount, and it is further ordered that the defendant herein pay all costs in this behalf expended for which execution may issue.

The judgment also awarded the Chapman estate title to the 240 acre property. There was no appeal.

Sixteen days after the case settled, Kleberg wrote to Ellery Brayton, explaining the agreed judgment:

> That the suit of Helen B. Chapman v. Richard King was disposed of at the last term of our district court which has just closed. John Rankin Executor was made party plaintiff in the suit and judgment was rendered by consent of parties as follows, it was considered by the court that half of the land sued for which was the half of 3½ leagues could be recovered by the plaintiff which would be 3874½ acres—also a tract of 240 acres and in consideration of a moneyed judgment for $5,811.75 against the Defendant Richard King—the title was vested to him to the 3874½ acres, and the title to the 240 acres was recovered in favor of the Estate of Helen B. Chapman thus

---

**2.** *The other co-executor, Ellery Brayton, was* married to Helen Chapman's daughter.

giving Judgment in favor of the Estate for $5,811.75....

Helen Chapman's son, William B. Chapman, was dissatisfied. In a May 21, 1883 letter to Brayton, Chapman wrote:

I was opposed to allowing King to take judgment for the property. We only get paid for this one part (?) of it (1/4). For the other part, it is thought that my father paid nothing. It is equally presumptive that neither did King.... I don't see why we could not have secured our title ... if anyone had taken any interest in the matter. I don't think anyone ever attempted to exercise (?) any evidence from [the administrator of the Lewis Estate].[3]

## C. King and Kleberg

While Cause No. 1279 was pending, Kleberg's law firm represented King in unrelated matters. In a July 24, 1881 letter to his parents, Robert Kleberg wrote that "[King] asked us to attend to his legal business for him." The Lackey Stayton & Kleberg firm represented King in *Sobrinos v. Chamberlain*, 76 Tex. 624, 13 S.W. 634 (1890), and *Domingue Rotge v. Richard King*. The *Sobrinos* case, filed in September 1881, involved a claim against the administrator of the estate of Hiram Chamberlain by a creditor of the estate. The creditor, Jose Sobrinos, alleged that the administrator of the estate, Bland Chamberlain, inappropriately paid certain claims made by King, who was a co-defendant. On March 17, 1882, Lackey Stayton & Kleberg made its first appearance in the case, filing an answer on King's behalf. *Rotge v. King*, filed in August 1881, involved a dispute over ownership of cattle. Lackey, Stayton & Kleberg filed an answer on behalf of King in the *Rotge* case in March 1882. The parties do not contend that the subject matter of these two cases related in any way to Cause No. 1279.

In 1885, two years after entry of the consent judgment in Cause No. 1279, Richard King died testate. He left his properties to his wife, Henrietta King. Kleberg became the manager of the King Ranch and, the following year, married Alice King, Richard and Henrietta's daughter. In 1904, Kleberg's nephew recorded the Lewis deed.

## D. THE KING RANCH, by Tom Lea (Little, Brown 1957).

In 1951, the King Ranch commissioned artist and author Tom Lea to prepare an illustrated history of the Ranch to commemorate the centennial of the Ranch's founding in 1853. The resulting two-volume work, entitled *The King Ranch*, contains Lea's fictional account of a conversation in 1881 between Robert Kleberg and Richard King in which King retained Kleberg's legal services for $5000 a year:

Before Kleberg dropped off to sleep, he heard a knock.

He got up, lit a lamp and went to the door. It swung open to reveal the impressive figure of Captain Richard King with his black hat and black beard, his black boots, his watch chain glinting yellow in the lamplight.

Standing uncomfortably self-conscious in his night shirt, the young lawyer said, "Come in, Captain King."

He came in and closed the door.

"Kleberg."

"Yes, Captain King."

"I'm looking for a good lawyer. How would a retainer of five thousand a year suit you?"

---

**3.** The parties provided transcriptions of some of the ancient, handwritten exhibits in this case. The question marks presumably were inserted by the transcriptionist. The parties do not dispute the accuracy of the transcriptions.

Robert Kleberg gulped. "Why—when would that start, sir?"

"Now."

Robert Kleberg gulped again.

"Right now," the captain said. "We will drive out to the Santa Gertrudis."

LEA, THE KING RANCH 340 (Little, Brown 1957).

### E. Caller–Times Article.

On August 23, 1992, the *Corpus Christi Caller–Times* published an article entitled *King and Kleberg Fought Widow for her Half Share of King Ranch.* The article, written by Ron George, contained the following quote attributed to Bruce Cheeseman, a King Ranch archivist and historian: "Clearly, Kleberg was looking after the interest of his in-state client versus the interests of his out-of-state client."

## II

### The Chapman Heirs' Claims

In 1995, twenty plaintiffs, self-described as the heirs or devisees of the Chapmans, sued some two hundred eight parties, who are alleged to own interests in the Rincon. The Chapman heirs sought a bill of review to set aside the 1883 judgment and asserted an alternative trespass to try title action to regain possession as cotenants. They alleged a conspiracy between King and Kleberg, claiming that the two "connived . . . to advance the interests of Richard King at the expense of the Estate of Helen Chapman." The Chapman heirs also alleged, based on their status as cotenants, that "all oil and gas leases . . . made after entry of the consent or agreed

judgment [in Cause No. 1279] . . . are now here ratified by the said Plaintiffs, entitling Plaintiffs to receive from the present lessee or lessees their proportionate share of all bonuses, delay rentals, royalties, and any other profits due to Plaintiffs. . . ."

King Ranch, joined by most of the other defendants, answered and moved for summary judgment under Rule 166a(c) and (i), TEX.R. CIV. P.[4] The motions asserted that (1) there was no evidence of King's extrinsic fraud or the Chapman heirs' freedom from negligence, two elements essential to the Chapman heirs' bill of review, (2) the action was barred by limitations, (3) the 1883 judgment bound all parties and barred the trespass to try title claim, and (4) King Ranch proved title to the property by adverse possession. The trial court granted the motions.[5]

The court of appeals reversed and remanded, holding (1) there was evidence of extrinsic fraud in the 1883 judgment, (2) the same evidence "avoided the four year statute of limitations for bills of review" and "raise[d] a genuine issue of material fact as to [the Chapmans'] trespass to try title action," and (3) King Ranch's adverse possession claim failed because King Ranch did not establish a repudiation of Mrs. Chapman's title as a matter of law. 41 S.W.3d 693, 704–07.

We granted the petitions for review. 46 Tex. Sup.Ct. J. 394 (Jan. 16, 2003).

## III

### Attorney Disqualification

Before turning to the issues raised in the petitions for review, we address a pre-

---

**4.** For ease of reference, the petitioners are referred to collectively as "King Ranch."

**5.** The Chapman heirs assert that, after granting King Ranch's summary judgment motion, a subsequent order granting summary judgment to other defendants effectively "ungranted" the first motion, because the second order contained a "Mother Hubbard" clause. We

reject this contention. There is no indication that the trial court intended to set aside the first order, *Lehmann v. Har–Con Corp.*, 39 S.W.3d 191, 205 (Tex.2001), and a later judgment does not automatically set aside an earlier interlocutory judgment, *Webb v. Jorns*, 488 S.W.2d 407, 409 (Tex.1972).

liminary matter. After King Ranch filed its petitions for review, but before they were granted, the Chapman heirs filed several emergency motions asking us to strike King Ranch's petitions for review and remand the case for discovery on whether one of King Ranch's attorneys, Russell McMains, should be disqualified. The Chapman heirs alleged that family member Edward C. Coker revealed privileged information to McMains in the course of a conversation discussing a possible appeal of the trial court's judgment. We abated the petitions and granted the motion to remand on the disqualification issue and directed the trial court to issue findings of fact and conclusions of law. On remand, the trial court scheduled a disqualification hearing.

In response to the Chapman heirs' objections to testimony from McMains allegedly implicating the attorney-client privilege, the trial court ordered that only the Chapman heirs' counsel be present during an in camera examination of McMains. Although it denied the heirs' request to cross-examine McMains during the in camera proceeding, the trial court permitted them to submit written questions to McMains in camera and allowed all parties to examine McMains in open court on matters for which asserted privileges were not at issue. The Chapman heirs petitioned us for a writ of mandamus to prevent the in camera examination from going forward or to permit them to cross-examine McMains during that examination. We denied the petition. 45 Tex. Sup.Ct. J. 227 (Dec. 17, 2001).

■ The trial court found that Coker's testimony was not credible, that he never established an attorney-client relationship with McMains, and that he had not disclosed confidential information to McMains. The court concluded that there was no valid ground to strike the petitions because the Chapman heirs did not meet their burden to establish that McMains was disqualified from representing King Ranch. Based on those findings, we lifted the abatement order and denied the motion to strike. Five months later, in response to the petitions for review, the Chapman heirs complained that the trial court erred in conducting the in camera inspection and that the court reporter failed to transcribe the in camera hearing. The heirs now claim they are entitled to a second disqualification hearing because they are unable to review a transcript of the in camera examination. We note, however, that the Chapman heirs' counsel attended the in camera examination, and the heirs do not contend that evidence presented at the hearing supports their disqualification claim. In any event, their challenges come too late. We ruled on these issues when we denied both the motion to strike and the petition for writ of mandamus. The Chapman heirs did not file a motion for rehearing or any other document seeking review of our rulings until more than five months after we issued them. We decline to revisit those issues.

## IV

### Standard of Review of No Evidence Motions for Summary Judgment

■ Because King Ranch's summary judgment motion was, in part, a no-evidence motion, we consider the evidence in the light most favorable to the non-movant. *Wal–Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex.2002); *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 208 (Tex.2002). A no-evidence summary judgment is essentially a pretrial directed verdict, and we apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in review-

ing a directed verdict. *See, e.g., Valero Mktg. & Supply Co. v. Kalama Int'l,* 51 S.W.3d 345, 350 (Tex.App.-Houston [1st Dist.] 2001, no pet.); *Blackburn v. Columbia Med. Ctr. Of Arlington Subsidiary,* 58 S.W.3d 263, 270 (Tex.App.-Fort Worth 2001, pet. denied); *Mansfield v. C.F. Bent Tree Apartment, L.P.,* 37 S.W.3d 145, 149 (Tex.App.-Austin 2001, no pet.); *Espalin v. Children's Med. Ctr.,* 27 S.W.3d 675, 683 (Tex.App.-Dallas 2000, no pet.); *Barraza v. Eureka Co.,* 25 S.W.3d 225, 231 (Tex. App.-El Paso 2000, pet. denied); *Moore v. K Mart Corp.,* 981 S.W.2d 266, 269 (Tex. App.-San Antonio 1998, pet. denied).

▇▇ Accordingly, we review the evidence in the light most favorable to the non-movant, disregarding all contrary evidence and inferences. *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). "A no evidence point will be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact." *Id.* (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEX. L.REV. 361, 362–63 (1960)). Thus, a no-evidence summary judgment is improperly granted if the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact. TEX.R. CIV. P. 166a(i); *Wal–Mart,* 92 S.W.3d at 506. Less than a scintilla of evidence exists when the evidence is "so weak as to do no more than create a mere surmise or suspicion" of a fact. *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex. 1983). More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharms.,* 953 S.W.2d at 711.

With this standard in mind, we turn to the claims made and the evidence adduced in this case.

## V

### Bill of Review

As outlined above, this is not the first time that Major Chapman's heirs have sued for title to the Rincon. The 1883 judgment in Cause No. 1279 adjudicated the claim over one hundred years ago. To succeed on their current claim to the Rincon, the Chapman heirs must somehow avoid the 1883 judgment quieting title in Richard King. The first claim they allege is a bill of review.

▇▇ A bill of review is an equitable proceeding to set aside a judgment that is not void on the face of the record but is no longer appealable or subject to a motion for new trial. *Baker v. Goldsmith,* 582 S.W.2d 404, 406 (Tex.1979); *Schwartz v. Jefferson,* 520 S.W.2d 881, 889 (Tex.1975). A bill of review is proper where a party has exercised due diligence to prosecute all adequate legal remedies against a former judgment, and at the time the bill of review is filed, there remains no such adequate legal remedy still available because, through no fault of the bill's proponent, fraud, accident, or mistake precludes presentation of a meritorious claim or defense. *Baker,* 582 S.W.2d at 408. The grounds upon which a bill of review can be obtained are narrow because the procedure conflicts with the fundamental policy that judgments must become final at some point. *Alexander v. Hagedorn,* 148 Tex. 565, 226 S.W.2d 996, 998 (1950); *Crouch v. McGaw,* 134 Tex. 633, 138 S.W.2d 94, 96 (1940) (noting that a bill of review requires "something more than injustice"). Thus, a

bill of review petitioner must ordinarily plead and prove (1) a meritorious defense to the cause of action alleged to support the judgment, (2) that the petitioner was prevented from making by the fraud, accident or wrongful act of his or her opponent, and (3) the petitioner was not negligent. *Alexander,* 226 S.W.2d at 998.

King Ranch's summary judgment motion asserted that there was no evidence of Richard King's alleged extrinsic fraud or the Chapman heirs' lack of negligence, two essential elements of the bill of review. Because the Chapman heirs would bear the burden of proof on a bill of review at trial, they were required to raise a fact issue on each of these elements. TEX.R. CIV. P. 166a(i).

## A. Extrinsic Fraud.

Fraud in relation to attacks on final judgments is either extrinsic or intrinsic. Only extrinsic fraud will support a bill of review. *Tice v. City of Pasadena,* 767 S.W.2d 700, 702 (Tex.1989). Extrinsic fraud is fraud that denied a party the opportunity to fully litigate at trial all the rights or defenses that could have been asserted. *Id.* Intrinsic fraud, by contrast, relates to the merits of the issues that were presented and presumably were or should have been settled in the former action. *Id.* Within that term are included such matters as fraudulent instruments, perjured testimony, or any matter which was actually presented to and considered by the trial court in rendering the judgment assailed. *Id.* Such fraud will not support a bill of review, because each party must guard against adverse findings on issues directly presented. *Id.; Alexander,* 226 S.W.2d at 998. Issues underlying the judgment attacked by a bill of review are intrinsic and thus have no probative value on the fraud necessary to a bill of review. *Tice,* 767 S.W.2d at 702.

Similarly, allegations of fraud or negligence on the part of a party's attorney are insufficient to support a bill of review. *Transworld Fin. Servs. Corp. v. Briscoe,* 722 S.W.2d 407, 408 (Tex.1987); *Gracey v. West,* 422 S.W.2d 913, 918–19 (Tex.1968). Thus, a bill of review petitioner who alleges that the wrongful act of his or her attorney caused an adverse judgment is not excused from the necessity of pleading and proving his or her opponent's extrinsic fraud. *Transworld,* 722 S.W.2d at 408.

## B. Kleberg's representation of King

The court of appeals held that the Chapman heirs "produced more than a scintilla of probative evidence to raise a genuine issue of material fact of extrinsic fraud." 41 S.W.3d at 705. In so holding, the court of appeals relied on several categories of evidence it found indicative of King's extrinsic fraud. The first such category involved Kleberg's representation of King in the late 1800s. Within that category, the court of appeals cited several pieces of evidence: an 1881 letter from Kleberg to his parents, Kleberg's representation of King in March 1881 in the *Sobrinos v. Chamberlain* case, the fictional conversation in Tom Lea's two-volume book, and the Cheeseman quote. We address each item in turn.

As set forth above, the 1881 letter from Kleberg to his parents states that King "asked us to attend to his legal business for him." The record confirms that Kleberg's firm represented King in two pieces of litigation unrelated to Cause No. 1279: *Rotge v. King* and *Sobrinos v. Chamberlain.* But simultaneous representation in unrelated matters is not evidence of a fraudulent conspiracy between Kleberg and King. Such dual representation is permissible under today's ethical rules and was not prohibited in the 1880s. *See* TEX. DISCIPLINARY R. PROF'L CONDUCT 1.06(b),

cmt. 11 (noting that "there are circumstances in which a lawyer may act as advocate against a client, for a lawyer is free to do so unless this Rule ... would be violated"); *Laybourne v. Bray & Shifflett*, 190 S.W. 1159, 1162 (Tex.Civ.App.-Amarillo 1916, no writ) (The "rule prohibiting an attorney once retained by a client from acting for the opposing party applies only in the case of conflicting interest").

The Chapman heirs allege that King paid Kleberg a $5,000 retainer during the pendency of Cause No. 1279 but rely solely on Tom Lea's fanciful account of a conversation between Kleberg and King to support the claim. Lea testified that he could not swear to the accuracy of the Kleberg/King conversation. Even if accurate, however, that conversation would not be evidence of extrinsic fraud because the fact that Kleberg may have simultaneously represented King and Chapman in unrelated cases was neither unethical nor fraudulent.

Finally, the Cheeseman quote provides no evidence of extrinsic fraud. Cheeseman denied making this statement to the reporter, but on review of a summary judgment, we assume the quote is accurate. *KPMG Peat Marwick v. Harrison County Housing Fin. Corp.*, 988 S.W.2d 746, 748 (Tex.1999). Even if accurate, Cheeseman's statement says nothing about King's actions or intent and cannot support an inference that King committed extrinsic fraud. Instead, it is a historian's opinion—given over one hundred years after the transaction at issue—questioning Kleberg's actions. Kleberg's actions, even if fraudulent, will not support a bill of review. *Transworld*, 722 S.W.2d at 408. In sum, none of the evidence of King and Kleberg's dealings supports an inference that King engaged in extrinsic fraud, because it does not provide "proof of some deception practiced by [King], collateral to

the issues in the case, which prevent[ed] the petitioner from fully presenting" claims or defenses in the underlying action. *Bakali v. Bakali*, 830 S.W.2d 251, 255 (Tex.App.-Dallas 1992, no writ).

## C. The Lewis deed

■ The court of appeals next focused on the Lewis deed as evidence of the alleged extrinsic fraud. The court observed that the deed, executed in 1856, was later found in the possession of King and recorded by Kleberg's nephew in 1904. 41 S.W.3d at 704. The court then concluded that "without the deed as the necessary proof of title, King's allegations that Chapman wanted out of the land purchase and had not paid his share had the potential of bearing more weight before the court in cause no. 1279." *Id.* We disagree. In Cause No. 1279, King swore to both the existence and the contents of the Lewis deed. Moreover, under the recording statute, the unrecorded deed was valid and binding on the parties thereto and their heirs. Act approved Feb. 5, 1841, 5th Cong., R.S. § 21, 1841 Repub. Tex. Laws 163, 169, *reprinted in* 2 H.P.N. GAMMEL, THE LAWS OF TEXAS 1822–1897, at 627, 633 (Austin, Gammel Book Co. 1898). As Justice Dorsey correctly noted, King's admission rendered harmless the absence of the actual deed. 41 S.W.3d at 709–10 (Dorsey, J., dissenting). Although the trial court subpoenaed the deed for trial, the case was settled and never tried. We cannot surmise that King would have been unable to produce the deed at trial. The Lewis deed and the circumstances of its recording do not provide evidence of King's alleged extrinsic fraud.

## D. The Powers Letter

■ As further evidence of King's extrinsic fraud, the court of appeals points to a November 3, 1880 letter from Stephen Powers of the Powers & Wells law firm, in

which he advised Richard King to compromise Cause No. 1279 because "I don't see how you are to get over Mrs. Chapman's title to the Santa Gertrudis interest." [6] 41 S.W.3d at 705. The court held that this statement "conflict[ed] with Kleberg's claim of inability to prove [Chapman's] title" under the Lewis deed. *Id.* Kleberg, however, did not make such a claim in the April 23, 1883 letter to Brayton to which the court of appeals refers. Instead, that letter accurately recounts the terms of the settlement as evidenced by the consent judgment (*i.e.* that "half of the land sued for" was "considered" as recovered by the estate). It does not identify which half was recovered, nor does it reveal Kleberg's thoughts on the matter. In any event, the decision to settle cannot support an inference that King committed extrinsic fraud. The fact of settlement establishes only that both sides wanted to compromise. By going to trial, the Chapman estate could have lost all. Settlement—particularly a settlement like this one, that awarded the Chapman estate $5,811.75 (over three times what King and Chapman agreed to pay for Lewis's one-half interest in the Rincon thirty years earlier) and title to 240 acres of property—may have been the most prudent course. As Justice Dorsey aptly noted, at the time of the consent judgment, both William and Helen Chapman were dead, and the heirs were litigating via long distance. 41 S.W.3d at 710. We would be remiss in concluding that, under the circumstances of that litigation, this settlement tended to establish a conspiracy between King and Kleberg that provided some evidence of King's extrinsic fraud.

### E. Payment for the Rincon

The court of appeals also focused on whether Chapman paid King for the Rincon as evidentiary support of King's alleged extrinsic fraud, holding that notations in William Chapman's account book provided some evidence that Chapman in fact paid King for his share of the land. 41 S.W.3d at 704. But the very question in Cause No. 1279, put in issue by King's sworn answer, was Chapman's alleged nonpayment. In that case, King's wife filed interrogatory answers stating that she and King received "not one cent" from Chapman, and Helen Chapman's interrogatory answers stated that she had no knowledge of King paying any money for the Rincon on behalf of her husband. The parties disagreed on this point, and they settled the matter with the 1883 Judgment. Thus, Chapman's account book—which, in any event, has been continuously in the Chapman family's possession for over 100 years—goes to payment for the Rincon, a point squarely at issue in Cause No. 1279 and therefore intrinsic to the judgment in that case.[7]

### F. Probate Court Approval

Finally, as evidence of Richard King's alleged extrinsic fraud, the court of appeals relied on the absence of evidence that Rankin, co-executor of Helen Chapman's estate, applied for or obtained probate court authority to settle Cause No. 1279. 41 S.W.3d at 704. Even if Rankin was required to do so by statute, the absence of evidence that he did does not impart a sinister motive. We cannot infer from the absence of evidence in a century-old probate court record that King caused Rankin to act without court authority, or that King induced Kleberg to cause Ran-

---

**6.** Neither Powers nor his firm entered an appearance on King's behalf in Cause No. 1279.

**7.** We note, too, that the record is devoid of evidence to support the court of appeals' statement that the account book, produced by the Chapmans in this litigation, had not been produced in Cause No. 1279.

kin to act without authority. The probate court record appears incomplete; for example, there is nothing indicating that the estate was closed or its assets distributed. In such cases, we apply a presumption, in the absence of evidence, in favor of the judgment. *Baker v. Coe,* 20 Tex. 429, 436–37 (Tex.1857) (public policy disfavors annulling titles even if the "records did not show a compliance with all the requirements of the law in respect to the disposition of the estates of deceased persons"). "Presumptions must be indulged in favor of such proceedings, especially when they are ancient, and titles have been acquired and transmitted under them, or it would indeed be true that time, instead of healing, as it should, the defects of these titles, would gradually undermine, and eventually destroy them." *Id.* at 437. Accordingly, the absence of evidence of probate court approval will not support an inference that King committed extrinsic fraud.

 Instead, we conclude that "[t]ime, which buries in obscurity all human transactions, has achieved its accustomed effects upon this." *Prevost v. Gratz,* 19 U.S. (6 Wheat.) 481, 495, 5 L.Ed. 311 (1821). In this case, the Chapman heirs have cobbled together a series of interesting historical tidbits and Texas folklore in an effort to regain title to one-half of the Rincon—an interest they claim is worth a substantial sum. Viewed separately, each of these tidbits fails to provide evidence of King's extrinsic fraud, and aggregated, they fare no better. While anything more than a scintilla of evidence is legally sufficient to survive a no-evidence summary judgment motion, "some suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence." *Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 927 (Tex.1993); *Kindred v.*

*Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex. 1983) ("When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence."). The Chapman heirs' extrinsic fraud claims are supported, in large part, by the absence of evidence—the dearth of complete records one hundred twelve years after judgment was entered, and the unavailability of any living witness to testify to the events at issue. The heirs urge us to second guess, with benefit of hindsight, the wisdom of settling ancient litigation. We decline to do so. As we recognized in 1857, we must apply a presumption in favor of ancient judgments, particularly those involving land titles, lest the passage of time destroy them. *Baker,* 20 Tex. at 437. We cannot conclude that conspiracy theories—fascinating but unsupported by evidence—may be used to upend a one hundred twenty year old judgment quieting title to the property. Because the Chapman heirs failed to produce even a scintilla of evidence of Richard King's alleged extrinsic fraud, their bill of review fails.[8]

# VI

## Trespass to Try Title

 The Chapman heirs also filed an alternative trespass to try title action, a procedure by which rival claims to title or right of possession may be adjudicated. *Yoast v. Yoast,* 649 S.W.2d 289, 292 (Tex. 1983). In 1879, Helen Chapman alleged just such a claim in Cause No. 1279. To avoid its effect, the Chapman heirs claim that the judgment is not binding on them because Texas law required Helen Chapman's heirs to be joined as parties in

---

**8.** Because the Chapman heirs failed to produce evidence of extrinsic fraud, we need not decide whether there was any evidence of the Chapman heirs' lack of negligence.

Cause 1279, and nothing in the record demonstrates such joinder. On this point, King Ranch moved for summary judgment on two separate grounds: (1) the judgment was valid without joinder of the minor heirs in Cause No. 1279, and (2) even if the judgment were void due to the non-joinder, King Ranch adversely possessed the property for a sufficient time to acquire title. Without discussing this point, the court of appeals held that the evidence in the record supporting a bill of review also raised a fact issue as to whether the 1883 judgment is void. 41 S.W.3d at 706. In addition, the court of appeals rejected the adverse possession claim, holding that repudiation was a fact issue. *Id.* at 707. We need not decide whether the minor heirs were necessary parties to Cause No. 1279, because we hold that King Ranch established adverse possession as a matter of law.

Adverse possession is "an actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person." TEX. CIV. PRAC. & REM.CODE § 16.021(1). King Ranch moved for summary judgment on the ten year and the two twenty-five year adverse possession statutes. *See* TEX. CIV. PRAC. & REM.CODE § 16.026–.028. The first of those twenty-five year prescriptions provides:

> A person, regardless of whether the person is or has been under a legal disability, must bring suit not later than 25 years after the day the cause of action accrues to recover real property held in peaceable and adverse possession by another who cultivates, uses or enjoys the property.

*Id.* § 16.027.

The court of appeals correctly noted that a co-tenant may not adversely possess against another co-tenant unless it clearly appears he has repudiated the title of his co-tenant and is holding adversely to it, *Todd v. Bruner,* 365 S.W.2d 155, 156 (Tex.1963), but it also held that whether there has been a repudiation of a non-possessory co-tenant's title is a question of fact. 41 S.W.3d at 707. While we agree that repudiation is often a fact question, when the pertinent facts are undisputed, repudiation may be established as a matter of law. *See Thedford v. Union Oil Co. of Cal.,* 3 S.W.3d 609, 613–14 (Tex.App.-Dallas 1999, pet. denied).

In *Republic Production Co. v. Lee,* 132 Tex. 254, 121 S.W.2d 973, 977 (1938), we considered the circumstances under which repudiation may be established between cotenants:

> It is a rule of wide application that if two or more tenants in common of a tract of land enter into a partition of same, and set apart the whole to the exclusion of a non-participating cotenant, such act of partition, when followed by adverse possession, even if wholly void as against the excluded cotenant, constitutes a complete and unequivocal repudiation of the cotenancy relationship. It is also well settled that such a partition, even though there be no sufficient record thereof as will give notice to the excluded cotenant, may be proven as an act manifesting an intention on the part of the participating cotenant to oust the other cotenant or repudiate the tenancy relationship with him.

In *Cryer v. Andrews,* 11 Tex. 170, 180 (Tex.1853), we faced a similar issue. In that case, a brother died intestate, survived by his siblings and their descendants. Several of those siblings initiated a partition action to quiet title to a piece of property owned by their brother before his death. Mildred Cryer, a sister who was also an heir, was not made a party to the partition action and was not awarded title

to any portion of the property. In 1839, the probate court divided the property among the other heirs. Eight years later, Mildred sued for her portion of the land. Her siblings plead adverse possession.

We recognized that the partition judgment was binding only on those parties who were before the court. We also held, however, that

> inasmuch as this partition was a notorious act of ouster, the other parties claiming the whole of the land, to the exclusion of the plaintiff, it would, on general principles, as against a citizen not laboring under a disability, operate as the commencement of prescription in favor of all who held adversely, under such decree; and possession under it, accompanied with the circumstances enumerated in the statute, would ripen into a bar against a joint owner thus disseized.

*Id.* at 181; *see also McCook v. Amarada Petroleum Corp.*, 93 S.W.2d 482, 484 (Tex. Civ.App.-Texarkana 1936, writ dism'd).

■ In Cause No. 1279, Helen Chapman judicially admitted repudiation, alleging in her original petition "[t]hat on the first day of January A.D. 1877 the Said Richard King entered upon said premises and ejected ... petitioner therefrom." Even if she had not admitted repudiation in her pleadings, the judgment in Cause No. 1279 itself was a "notorious act of ouster," repudiating any claim of title by Helen Chapman or her heirs by providing that "it is now here, by consent of the parties hereto, ordered, adjudged and decreed by the court, that all the right title and interest in the said grant originally made to Juan Mindeola [sic] be vested in Richard King, the defendant here, and that he be quieted in his possession of the said tract of land described in plaintiff's petition." *See Cryer*, 11 Tex. at 181. If—

as the Chapman heirs contend—that judgment was a nullity as to them, the statute continued to run against the heirs notwithstanding their minority. TEX. CIV. PRAC. & REM.CODE § 16.027; *see also Moody's Heirs v. Moeller*, 72 Tex. 635, 10 S.W. 727, 728 (1889) (holding that prescriptive period continued against heirs seeking title "notwithstanding any disability of coverture or minority"). As a matter of law, repudiation occurred not later than April 7, 1883, the date the court entered judgment in Cause No. 1279.

■ King Ranch also produced summary judgment evidence on the remaining elements of adverse possession, establishing as a matter of law that it has cultivated, used, and enjoyed the Rincon for over a hundred years. By holding that a fact issue existed as to whether King Ranch has adversely possessed property it has used openly, notoriously, and exclusively for over one hundred years, despite the undisputed facts of record, the court of appeals ignored our precedent and frustrated the policy behind our adverse possession statutes. *Republic Nat. Bank of Dallas v. Stetson*, 390 S.W.2d 257, 262 (Tex.1965) ("The policy behind statutes which permit adverse possession is the settlement and repose of titles."); *Wilson v. Daggett*, 88 Tex. 375, 31 S.W. 618, 619 (1895). Without such laws, "time, instead of lending a helping hand to cure apparent defects and remove opposing claims, will only be the means and afford a ready opportunity of rendering [titles] less secure against mistakes, frauds, and perjuries. The older the title the less secure it becomes against such attacks." *Howard v. Colquhoun*, 28 Tex. 134, 145 (1866). We hold that King Ranch satisfied the requirements of the statute and proved adverse possession of the Rincon as a matter of

law.[9]

## VII

### Conclusion

[T]o permit multiple actions leaves an undesirable uncertainty in the economic affairs of those subject to them. Thus, the social interest in preserving free marketability of property, recognized in recording and registration acts and in statutes of limitations, can be undermined by allowing repeated litigation of the same title on various grounds existing at the time the first action is brought. It is also unjust to a party who may have made improvements on land in reliance on the first judgment; or worse, it may discourage him from improving his land in the first place.

*Developments in the Law—Res Judicata,* 65 HARV. L.REV. 818, 827–28 (March 1952). This case demonstrates the wisdom in protecting the stability of final judgments. Richard King and William Chapman, along with every witness with personal knowledge of the events at issue, have long since expired. The paper trail of evidence, though surprisingly detailed, cannot turn speculation about King's motives into evidence of his fraud. Assuming we had the ability, more than a century later, to ferret from history facts supporting the Chapman heirs' claim, we must nevertheless presume that, absent extrinsic fraud, the 1883 judgment settled the dispute, once and for all. Even if not settled by judgment, the King Ranch's continued dominion over the Rincon, in a manner obviously hostile to the heirs' claims, establishes adverse possession conclusively.

**9.** Because King Ranch, Inc. established adverse possession as a matter of law, the lessors of the minerals underlying the entire King Ranch, were also entitled to summary

Accordingly, we reverse the court of appeals' judgment and render judgment that the Chapman heirs take nothing.

Justice ENOCH and Justice O'NEILL did not participate in the decision.

judgment on the Chapman heirs' trespass to try title claim, because the Chapman heirs' purported ratification of any mineral lease was without effect.