

IN THE

TENTH COURT OF APPEALS

No. 10-10-00189-CV

IN THE ESTATE OF FRANKIE L.  ROSS, DECEASED

From the 220th District Court
Hamilton County, Texas
Trial Court No. CV-09309

MEMORANDUM  OPINION

In this will-contest case, Appellant Emmett Weldon Luker filed an opposition to the probate of his sister Frankie L. Ross's May 22, 2009 will, which named Appellee Billy D. Wilson as independent executor and bequeathed her estate in equal shares to Wilson, her longtime companion and close friend, and to Donald Ross, her brother-in-law.[1]  Luker asserted that Frankie lacked testamentary capacity to execute her will and that it was executed as a result of Wilson's and/or Donald's undue influence.[2]  Because

---

[1] Luker's opposition was filed after the trial court signed an order admitting the will to probate and appointed Wilson as executor.  In a companion appeal, Luker challenged the validity of that order.  *In re Estate of Ross,* No. 10-09-00334-CV (Tex. App.—Waco Nov. 30, 2011, no pet. h.).  Our decision in that appeal affirms that order.  *See id.*

[2] The self-proving affidavit accompanying Frankie's will prima facie establishes her testamentary capacity, but the will remained subject to contest.  *See Urbanczyk v. Urbanczyk,* 278 S.W.3d 829, 833 n.3 (Tex. App.—Amarillo 2009, no pet.).

Luker filed the will contest after the trial court admitted the will to probate, he had the burden of proof on those issues. *See In re Estate of Flores,* 76 S.W.3d 624, 629 (Tex. App.—Corpus Christi 2002, no pet.).

Wilson filed a no-evidence motion for summary judgment asserting that there is no evidence that Frankie lacked testamentary capacity or that her will was executed as a result of undue influence. He also filed a traditional motion for summary judgment asserting that his summary–judgment evidence conclusively establishes that no genuine issue of material fact exists on Luker's claims. The trial court granted Wilson's motions, and Luker appeals.

Luker's second issue asserts that the trial court erred in granting Wilson's summary-judgment motions. We review a trial court's summary judgment de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). Once a no-evidence motion for summary judgment is filed, the burden shifts to the nonmoving party to present evidence raising an issue of material fact as to the elements specified in the motion. *Mack Trucks, Inc. v. Tamez,* 206 S.W.3d 572, 582 (Tex. 2006). The nonmovant must produce "summary judgment evidence raising a genuine issue of material fact." TEX. R. CIV. P. 166a(i). A genuine issue of material fact exists if more than a scintilla of evidence establishing the existence of the challenged element is produced. *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex. 2003). More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Id.* On the other hand, the evidence amounts to no more than a scintilla if it is "so weak as to do no more than create a mere surmise or

suspicion" of fact. *Id.* When determining if more than a scintilla of evidence has been produced, the evidence must be viewed in the light most favorable to the nonmovant. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

Luker's summary-judgment evidence shows the following background: Frankie was eighty years old, and Moody Ross, her only husband, died in 1985. She had no children. On April 13, 2009, after having fallen twice and injuring her arms, Frankie was hospitalized for weakness and shortness of breath. On April 23, she was discharged from the hospital and admitted to Hico Care Center, a nursing home, for rehabilitation. On May 22, around lunchtime, Frankie executed her will in her nursing-home room. Cherry Pearcy, a paralegal for attorney Bill Oxford, brought the will to the nursing home for execution. Pearcy notarized the will, and the witnesses were Patricia Berna, a nursing-home medication aide, and Brittney Schroen, a nurse's assistant.

Later on May 22, around 6:00 p.m., Frankie was discovered on the floor, having fallen while trying to get out of bed. Berna drove Frankie to the emergency room, but she was released back to the nursing home. On May 23, the hospital called the nursing home to report that Frankie's hip was broken, and she returned to the hospital that day by ambulance for surgery. She died in the hospital on May 25.

> A testator has testamentary capacity when he has sufficient mental ability to understand he is making a will, the effect of making a will, and the general nature and extent of his property. *In re Estate of Blakes,* 104 S.W.3d 333, 336 (Tex. App.—Dallas 2003, no pet.). He must also know his next of kin and the natural objects of his bounty, the claims upon them, and have sufficient memory to collect in his mind the elements of the business transacted and hold them long enough to form a reasonable judgment about them. *Id.*

The pivotal issue is whether the testator had testamentary capacity on the day the will was executed. *Id.* However, evidence of the testator's state of mind at other times can be used to prove his state of mind on the day the will was executed provided the evidence demonstrates a condition affecting his testamentary capacity was persistent and likely was present at the time the will was executed. *Id.*

*Long v. Long,* 196 S.W.3d 460, 464-65 (Tex. App.—Dallas 2006, no pet.); *see Croucher v. Croucher,* 660 S.W.2d 55, 57 (Tex. 1983) ("Evidence of incompetency at other times can be used to establish incompetency on the day the will was executed if it 'demonstrates that the condition persists and has some probability of being the same condition which obtained at the time of the will's making.'") (citing and quoting *Lee v. Lee,* 424 S.W.2d 609, 611 (Tex. 1968)).

Courts have more recently stated the circumstantial-evidence test as follows:

Thus, to successfully challenge a testator's mental capacity with circumstantial evidence from time periods other than the day on which the will was executed, the will contestants must establish (1) that the evidence offered indicates a lack of testamentary capacity; (2) that the evidence is probative of the testator's capacity (or lack thereof) on the day the will was executed; and (3) that the evidence provided is of a satisfactory and convincing character, because probate will not be set aside on the basis of evidence that creates only a suspicion of mental incapacity. *See Horton v. Horton,* 965 S.W.2d 78, 85 (Tex. App.—Fort Worth 1998, no pet.).

*In re Estate of Graham,* 69 S.W.3d 598, 606 (Tex. App.—Corpus Christi 2001, no pet.); *see Lewis v. Lamb,* No. 09-06-00201-CV, 2007 WL 2002901, at *2 (Tex. App.—Beaumont July 12, 2007, no pet.) (mem. op.); *In re Estate of Price,* No. 04-05-00438-CV, 2006 WL 3725542, at *3 (Tex. App.—San Antonio Dec. 20, 2006, pet. denied) (mem. op.).

Luker did not present any direct evidence that Frankie lacked testamentary capacity on May 22, 2009, so the questions are (1) whether Luker's evidence was the

kind that would indicate lack of testamentary capacity; (2) if so, was that evidence probative of Frankie's lack of testamentary capacity on May 22, 2009; and (3) whether the evidence provided is of a satisfactory and convincing character. *See Croucher,* 660 S.W.2d at 57; *Estate of Graham,* 69 S.W.3d at 606.

Luker first points to excerpts from Frankie's hospital records. He notes the records show that she had cataracts, that Wilson signed a form for her to receive a flu shot, and that she was "tired" on April 22. An April 20 entry describes Frankie as "forgetful," but the entire description is "alert & oriented but forgetful." Luker also points to notations of "depression" on January 10 and 11, 2009 (an earlier hospitalization) and April 13, 15, 16, and 22, but each of those notations are accompanied by notations of no "confusion/disorientation," and a January 9 note describes her as "alert" and "oriented." On April 14, Frankie was described as "poorly motivated to move," but she was also described as "lucid." On three undated days, she was noted to be "coping poorly" and refused a bath on one of those days. None of this evidence indicates lack of testamentary capacity. Moreover, the hospital records filed by Luker contain an April 13 physician's "history and physical" that describes her as "alert and well oriented" and an April 23 description of her as "lucid."

Luker next points to excerpts from Frankie's nursing-home records. On April 27, she was described as "forgetful at times," but she was also described as alert and "in good spirits." On April 30 she was described as "slow to respond" but again was also described as alert. A May 11 note states that Frankie did not want to get out of bed except for therapy, but two notes that day describe her as alert and oriented. The May

22 note states that she fell in her room when her walker flipped.

None of this evidence indicates lack of testamentary capacity. Moreover, the nursing-home records filed by Luker contain a fall-risk assessment that scores Frankie as being alert and not being disoriented or having any intermittent confusion. An undated evaluation describes her as "alert/oriented." A note on the morning of May 22 (the day the will was executed and the day she later fell) describes Frankie as "alert" and "able to make needs known," and the note for the beginning of the 3:00 p.m. shift that day states that she is "alert, oriented x3" and "able to make needs known."

Luker's summary-judgment evidence includes excerpts from the deposition of Brittney Schroen, the nursing home assistant who helped care for Frankie and witnessed the will's execution. Schroen said that the only relative Frankie ever mentioned was her deceased husband, but Schroen also said that she did "not really" talk to Frankie about her property and family. Schroen also testified that she did not see evidence of Frankie being forgetful and that Frankie seemed "pretty coherent." Luker also points to Shroen's testimony that Frankie would lie in bed moaning in pain, but Schroen said that this happened "toward the beginning" two or three times a week and that pain medication would calm down the pain but "it never affected her mental status." None of Schroen's testimony indicates lack of testamentary capacity. Furthermore, Schroen testified about how Frankie and Cherry Pearcy asked her and Patricia Berna to come to Frankie's room to be witnesses to Frankie's execution of her will. Frankie told her she had read the will, and Schroen observed her looking it over and initialing every page and then signing it on the two pages that Schroen thereafter

signed as a witness.

Luker also points to excerpts from the deposition of Berna, the nursing-home medication aide who also helped care for Frankie and witnessed the will's execution. Berna said that pain and pain medication can make a person confused, that Frankie was in pain (from her arm), and that she gave Frankie pain medication (Vicodin), but Berna did not say that Frankie was in fact confused because of pain or pain medication or that she was confused from pain or pain medication when the will was executed. *See Long*, 196 S.W.3d at 466 (testator's medical records showed isolated instances of medicated confusion, but nothing showed this continued to time will was executed). None of Berna's testimony indicates lack of testamentary capacity. Furthermore, Berna testified about how Pearcy asked her and Schroen to witness Frankie's will. Berna observed Pearcy handing Frankie the will and Frankie reading over and signing each page. After Pearcy read out loud the self-proving affidavit, Frankie said that the will was what she wanted, and then Berna and Schroen signed the will in two places.

On the issue of testamentary capacity, Luker finally points to excerpts from Pearcy's deposition. Pearcy said that on May 18, Wilson left her a telephone message asking her to come to the nursing home and see Frankie. She also received a call that day from the nursing home administrator to come and see Frankie. The next day, Wilson came by Pearcy's office and again told her that Frankie wanted Pearcy to see her at the nursing home.

Pearcy visited Frankie around 10:00 a.m. on May 20; no one else was present. Frankie told Pearcy that she wanted to change her will. Pearcy reminded Frankie that

she already had a will, but Frankie said that she wanted to change her will from twenty-three beneficiaries to two and to leave everything to Billy Wilson and Don Ross. Pearcy had found Frankie's existing will on her computer and had printed a copy, and she reminded Frankie that her existing will had twenty-three beneficiaries and wanted to make sure that this was exactly what Frankie wanted to do.[3] Frankie told her again that she wanted to change it to Wilson and Don; they were the people in her life who came to see her, who cared for her, and who she wanted to be the beneficiaries of her estate. Pearcy and Frankie visited for thirty to forty-five minutes; they also discussed her health, her situation, her being released from the nursing home soon and getting to go home, and church.

After leaving, Pearcy informed attorney Bill Oxford, her employer, about what had gone on, and he directed her to prepare a draft of the will. Oxford reviewed the draft and corrected a few minor mistakes. Pearcy returned to the nursing home around 10:30 a.m. on May 22 to have Frankie execute the will. She and Frankie first read over the will page by page to "make sure it was right," which took around twenty minutes. Pearcy then left the room to find two witnesses and returned with Berna and Schroen. Next, Pearcy explained that Frankie was going to execute her will, and she had Frankie initial each page. Pearcy then asked Frankie if she knew what the will said, and Frankie said that she did. Pearcy next asked her if anyone had encouraged her or coerced her to do this will, and she replied, "no, absolutely not." Pearcy then swore Frankie and the

---

[3] Luker's summary-judgment evidence includes Frankie's 2004 will. Of the twenty-three named beneficiaries, the first one listed is Wilson. The remaining beneficiaries were all relatives and included Luker and Don Ross.

witnesses, and they all signed the will and the self-proving affidavit.

Luker asserts that Pearcy's deposition testimony reflects that, in her meeting with Frankie on May 20, Pearcy did not discuss with Frankie whether anyone was being "written out of the will" and that Pearcy did not discuss Frankie's relatives with her. That assertion is partially inaccurate. As set forth above, Pearcy testified that she discussed with Frankie that her 2004 will had twenty-three beneficiaries, but Frankie now wanted to leave her estate to only two of them—Wilson and Don Ross (who was a relative). Thus, Pearcy did discuss with Frankie her desire to "write out of the will" twenty-one relatives, and Frankie explained why she wanted to do that. That Pearcy did not specifically discuss with Frankie each relative being "written out of the will" is not indicative of a lack of testamentary capacity. Luker also asserts that Pearcy did not ask Frankie about her knowledge of her property, but the deposition excerpts filed by Luker reflect that Pearcy was not questioned about whether she asked Frankie about her knowledge of her own property.

In conclusion, none of Luker's summary-judgment evidence indicates a lack of testamentary capacity and thus does not raise a genuine issue of material fact on Frankie's lack of testamentary capacity. The trial court properly granted Wilson's no-evidence motion for summary judgment on that ground.

Wilson also moved for summary judgment on the ground that there is no evidence that Frankie's will was executed as a result of undue influence and that there is no evidence on the three elements of undue influence. A person of sound mind has the right to dispose of his or her property in the manner he or she wishes. *Rothermel v.*

*Duncan*, 369 S.W.2d 917, 923 (Tex. 1963). To establish undue influence, a party must show: (1) the existence and exertion of influence; (2) the effective operation of an influence so as to subvert the will or overpower the mind of the grantor at the time of the execution; and (3) the execution of an instrument the maker would not have executed but for such influence. *Id.* at 922. There must be some evidence to show that the influence was not only present, but was exerted with respect to making the instrument. *Id.*; *Cotten v. Cotten*, 169 S.W.3d 824, 827 (Tex. App.—Dallas 2005, pet. denied). But, the exertion of undue influence cannot be inferred by opportunity alone. *Cotton*, 169 S.W.3d at 827.

Undue influence may be proved by circumstantial, as well as direct, evidence. *See Rothermel*, 369 S.W.2d at 922. "Although a contestant may prove undue influence by circumstantial evidence, the evidence must be probative of the issue and not merely create a surmise or suspicion that such influence existed at the time the will was executed." *Estate of Graham*, 69 S.W.3d at 610 (citing *Rothermel*, 369 S.W.2d at 922).

Luker cites excerpts from the depositions of Oxford, Wilson, and Don Ross as some evidence of undue influence by Wilson and Don Ross. Oxford testified that Pearcy called him to tell him that Frankie was in a nursing home and wanted to change her will from twenty-three beneficiaries to only Wilson and Don Ross because they were the only two who visited her and cared about her. Oxford was concerned that Frankie was elderly, in a nursing home, and wanted to change her will, so he questioned Pearcy about Frankie's state of mind and her reason for changing her will. Pearcy told him that Frankie's state of mind was fine and she knew what she was doing,

that she was about to be released from the nursing home, and that she was adamant about changing her will because only Wilson and Don Ross visited her and cared about her. Oxford never communicated with Frankie for either will and did not know the size of her estate, but he recalled her 2004 will (and its twenty-three beneficiaries) that Pearcy had prepared under his supervision; he relied on Pearcy's lengthy relationship with Frankie.

Don Ross testified that he visited Frankie every day in the nursing home. Wilson testified that he visited Frankie in the nursing home normally about three times a day. Frankie asked him to call Pearcy to come to the nursing home to see Frankie because she wanted to change her will. Wilson was familiar with Frankie's 2004 will because he was named as executor and had a power of attorney for Frankie, and she had given him a copy of both instruments.

The evidence that Wilson and Don Ross visited Frankie every day in the nursing home, and that Frankie changed her will to leave her estate to only Wilson and Don Ross because they were the only ones to visit and care for her, is no evidence of the existence and exertion of influence by either of them. *See Rothermel*, 369 S.W.2d at 923 ("The establishment of the circumstances of having an opportunity to exert such influence due to being in a position of caring for the person upon whom the influence is supposed to be exerted is equally consistent with the theory of innocence as it is with the theory of wrongdoing."). The exertion of undue influence cannot be inferred by opportunity alone. *Cotton*, 169 S.W.3d at 827; *see Rothermel,* 369 S.W.2d at 923 ("It is the law in Texas that a will cannot be set aside on proof of facts which at the most do no

more than show an opportunity to exercise influence."). This evidence amounts to no more than a scintilla because it is "so weak as to do no more than create a mere surmise or suspicion" of fact. *King Ranch,* 118 S.W.3d at 751.

Luker also asserts that Wilson's motive to unduly influence Frankie can be inferred from the circumstantial evidence of Wilson's transfer of estate assets to himself and to Don Ross after Wilson was appointed independent executor[4] and Wilson's omission of $130,000 in assets from the original inventory, appraisement and list of claims.[5] Wilson testified that, in transferring the assets, he was just executing the will according to his attorney's advice.

One of the factors to be considered when determining whether undue influence exists in a particular case is "the existence of a fraudulent motive." *Estate of Graham*, 69 S.W.3d at 609 (citing *Rothermel,* 369 S.W.2d at 923). We assume without deciding that this subsequent conduct by Wilson as executor is circumstantial evidence of a fraudulent motive, but Luker's circumstantial evidence amounts to no evidence under the equal-inference rule.

If the evidence permits two inferences, equally consistent with two facts, neither fact may be inferred. *City of Keller v. Wilson*, 168 S.W.3d 802, 813-14 (Tex. 2005). "When circumstantial evidence is so slight that the choice between opposing plausible inferences amounts to nothing more than speculation, it is legally no evidence at all." *Muela v. Gomez,* 343 S.W.3d 491, 496 (Tex. App.—El Paso 2011, no pet.) (citing *Lozano v.*

---

[4] The parties subsequently entered into an agreed order providing that all estate funds, including the distributed assets, would be held until further court order.

[5] Wilson filed an amended inventory after Luker filed an objection asserting errors in the inventory.

*Lozano,* 52 S.W.3d 141, 148 (Tex. 2001)).

If we disregard Wilson's testimony that he transferred the assets in carrying out his executor's duties, an inference that he was doing so is equally plausible with having a fraudulent motive. Likewise, an inference that Wilson's omission of $130,000 in assets from the original inventory was the result of a mere oversight is equally plausible with having a fraudulent motive. Accordingly, this circumstantial evidence of motive is speculation and no evidence.

In conclusion, none of Luker's summary-judgment evidence raises a genuine issue of material fact on the existence and exertion of influence by Wilson or Don Ross. The trial court properly granted Wilson's no-evidence motion for summary judgment on that ground.

Because the trial court properly granted Wilson's no-evidence motion for summary judgment on both of Luker's claims, we overrule in part issue two and need not address the trial court's grant of Wilson's traditional motion for summary judgment. We also thus need not address issue one, which concerns the trial court's overruling Luker's objections to Wilson's summary-judgment evidence in support of Wilson's traditional motion for summary judgment. We affirm the trial court's order granting Wilson's no-evidence motion for summary judgment.

REX D. DAVIS
Justice

Before Chief Justice Gray,
 Justice Davis, and
 Justice Scoggins
Affirmed
Opinion delivered and filed November 30, 2011
[CV06]