

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-14-00192-CV

DUDLEY MCAFEE                                                    APPELLANT

V.

MONTE GLEN YANCEY                                               APPELLEE

----------

FROM COUNTY COURT AT LAW NO. 1 OF WICHITA COUNTY
TRIAL COURT NO. CCL-605-12-E

----------

## MEMORANDUM OPINION[1]

----------

In two issues, appellant Dudley McAfee appeals the trial court's final protective order, contending that the evidence is legally and factually insufficient to support it. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## Background Facts[2]

Appellant has a romantic relationship with Karie Carr. Carr and appellee Monte Glen Yancey previously dated each other. Their relationship produced a child, Gregory,[3] in 2010, but it ended in 2012. Carr and appellee share Gregory's custody.

Gregory's preschool-aged soccer team played a match on a Saturday morning in March 2014. Appellee coached the team, and appellant and Carr attended the match. At the end of the match, appellant and appellee started arguing with each other.

According to appellee's witnesses, the argument began when appellee asked appellant to call him on the telephone because there was "something they needed to talk about." Specifically, appellee testified that he wanted to talk to appellant about appellant's kicking Carr's residence door in and his "drinking and driving with . . . kids in the car." Appellee also testified that leading up to the incident at the soccer field, he had been attempting for a while to reach appellant and had asked Carr several times to have appellant call him.

---

[2]The first part of this section presents the facts as told by witnesses called by appellee. Appellant presented differing evidence, some of which we will detail toward the end of the section. The trial court found that evidence presented by appellant was not credible.

[3]To protect the child's identity, we use an alias. *See* Tex. R. App. P. 9.9(a)(3) (indicating that a child's name is among "sensitive data" that should be safeguarded in appellate proceedings).

Appellant responded by stating that he did not "need to [f-----g] call [appellee] about nothing" and that he did not "answer to" appellee.[4] The dispute quickly became heated as appellant and appellee stood face to face. Appellant told appellee that appellee had "never met anybody" like appellant.

Appellee, who did not raise his voice during the dispute (according to one witness) but at some point said that he would "kick [appellant's] ass," attempted to withdraw from the confrontation and apologized to bystanders for what had occurred. But appellant continued screaming. Appellee told appellant that he was not an eleven-year-old football player that appellant could intimidate.[5]

Appellant called appellee a "mother [f----r]," threw his sunglasses on the ground, and asked appellee if he wanted to "go." Appellant pushed appellee's chest and hit appellee's chin.[6] Appellee then hit appellant, who landed on the ground. Bystanders intervened; appellee held his hands up to indicate that he was finished, but appellant repeatedly screamed that he would kill appellee, continued to use profanity, and said that he knew where appellee lived or that he

---

[4]One witness testified that appellant said that he did not have anything to "[f-----g] say to [appellee]."

[5]The record indicates that appellant has coached youth football.

[6]The trial court admitted photographs of appellee's chin, which was bruised and discolored two days after the fight. Appellant testified that he never touched appellee's chin and that he did not cause the injury depicted in the photographs.

3

could learn where appellee lived.[7]  Appellee waited at the soccer field until police arrived.

In early April 2014, appellee filed an application for a protective order aimed at shielding himself and Gregory from family violence by appellant.  The application stated that a protective order was in appellee's best interest and that appellant had

> committed acts that were intended . . . to result in physical harm, bodily injury, assault, or . . . were threats that reasonably placed [appellee] in fear of imminent physical harm, bodily injury, [or] assault . . . .   [Appellant's] acts therefore constitute[d] family violence.
>
> [Appellant's] conduct was reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass [appellee].

Among other acts, appellee sought to restrict appellant from communicating with appellee or Gregory in a threatening manner, from harassing or annoying appellee or Gregory, and from going to Gregory's school or residence.  To the application, which sought temporary ex parte relief along with permanent relief, appellee attached an affidavit.

The day after appellee filed the petition, the trial court signed a temporary ex parte protective order, finding that appellee "was in a dating relationship with an individual who is in a dating relationship with [appellant]" and that there was a danger of family violence unless the court restricted appellant from engaging in

---

[7]Appellee estimated that appellant said twenty times that he was going to kill appellee.

4

certain acts. The court set a trial date to determine whether to make the protective order final. Appellant filed an answer in which he generally denied appellee's allegations.

The trial court conducted a bench trial. Appellant testified that appellee had approached him aggressively and confrontationally after the soccer match and had said that he did not want appellant to be around Gregory. According to appellant, he told appellee that he liked Gregory and said that Carr could "make[] the rules" when Gregory was with her. Appellee accused appellant of kicking in Carr's door, and appellant admitted to kicking the door but said that he did not "kick in" the door and was not attempting to get into Carr's house.[8] Appellee also accused appellant of drinking and driving with children in his car, but appellant denied doing so.

Appellant testified that at some point, Carr attempted to intervene so he and appellee would stop arguing. But appellee badgered appellant and continued confronting him; he bumped appellant's nose, tapped his chest with a water bottle, and told him that he could kick his ass. Appellant then pushed appellee (but did not attempt to hit him), and appellee hit appellant's mouth, causing it to bleed. Appellant began saying, "I'm gonna get you for that." Appellee continued to taunt appellant, referring at one point to appellant's youth football coaching. Appellant did not remember whether he had said that he

---

[8]Appellant testified that he kicked the door because he was heartbroken after believing that Carr was in her house with another man.

5

would kill appellee, but he admitted that after appellee hit him, he said things that he was not proud of.

Carr testified that at the end of the soccer match, appellee "made a beeline over to" appellant. Speaking forcefully, appellee told appellant that appellant needed to call him and that he did not want appellant around Gregory. Carr could discern that the argument was escalating, so she took Gregory away from it. After she walked away some distance, she saw appellee approach appellant chest to chest and appellant push appellee's chest, but she did not see appellant swing his fist at appellee. At the time, Carr was too far away to hear what the men were saying to each other. According to Carr, on multiple occasions, appellee has made threats to her that concern appellant.

After the parties rested, the trial court entered a final protective order. The court found that appellant had committed dating violence against appellee "because of [appellee's previous] dating relationship with" Carr. The court also found that such violence was likely to occur in the future and that a protective order was in appellee's best interest. The final order restricted appellant from engaging in several acts toward appellee until April 2016, but unlike in the temporary order, the court did not include Gregory as a "Protected Person."

On appellant's request, the trial court entered findings of fact and conclusions of law. Appellant brought this appeal.

6

## Evidentiary Sufficiency

Appellant contends that the evidence is legally and factually insufficient to prove the requirements for granting a protective order under the family code. A trial court's findings of fact have the same force as answers to jury questions and are reviewable for legal and factual sufficiency of the evidence by the same standards.[9] *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *see MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 663 n.3 (Tex. 2009).

We may sustain a legal sufficiency challenge only when the record discloses a complete absence of evidence of a vital fact, the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, the evidence offered to prove a vital fact is no more than a mere scintilla, or the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999). In determining whether there is legally sufficient evidence to support the finding under review, we must consider

---

[9]There is disagreement among our sister intermediate appellate courts as to the proper standard of review to be applied in appeals from protective orders. At least one court has held that because a protective order provides relief similar to an injunction, the proper standard of review is abuse of discretion. *See Franklin v. Benton-Elam*, No. 06-13-00126-CV, 2014 WL 1722165, at *7 (Tex. App.—Texarkana Apr. 30, 2014, no pet.) (mem. op.). But other courts, including this one, have applied legal and factual sufficiency standards of review to appeals from protective orders. *See, e.g., Clements v. Haskovec*, 251 S.W.3d 79, 84 (Tex. App.—Corpus Christi 2008, no pet.); *Jakobe v. Jakobe*, No. 02-04-00068-CV, 2005 WL 503124, at *1 n.4 (Tex. App.—Fort Worth Mar. 3, 2005, no pet.) (mem. op.) ("We believe sufficiency of the evidence of the protective order is more appropriately measured by legal and factual sufficiency contentions.").

evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003), *cert. denied*, 541 U.S. 1030 (2004) (citing *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

A trial court must render a protective order if it finds that family violence has occurred and is likely to occur in the future. *See* Tex. Fam. Code Ann. §§ 81.001, 85.001(b)(1), .022 (West 2014). "Family violence" includes "dating violence." *Id.* § 71.004(3) (West 2014). Pertinent to this appeal, the family code

8

defines dating violence as a violent act that is committed against a victim "*because of* the victim's marriage to or dating relationship[10] with an individual with whom the actor is or has been in a dating relationship or marriage." *Id.* § 71.0021(a)(1)(B) (emphasis added).

Appellant challenges the trial court's final protective order on two grounds. He contends in his first issue that the evidence is legally and factually insufficient to show that dating violence (and therefore family violence) occurred "because of" appellee's prior dating relationship with Carr, and he argues in his second issue that the evidence is legally and factually insufficient to prove that such violence is likely to occur in the future. *See id.* §§ 71.0021(a)(1)(B), .004(3), 85.001(a)(2).

**The "because of" requirement**

The trial court's forty-ninth finding of fact states, "Dating violence by [appellant] was committed against [appellee] because of [appellee's] dating relationship with . . . Carr, with whom [appellant] is in a dating relationship . . . ." Appellant contends that any violence he committed against appellee was not "*because of*" appellee's former dating relationship with Carr but was instead

---

[10]A dating relationship is a "relationship between individuals who have or have had a continuing relationship of a romantic or intimate nature." Tex. Fam. Code Ann. § 71.0021(b) (West 2014). Appellant does not dispute that he has a dating relationship with Carr and that appellee previously had a dating relationship with her.

9

because of appellee's concern about appellant's relationship with Gregory. He argues,

> [T]he testimony of [appellant and appellee] is remarkably consistent that the issue between them had to do with [a]ppellee's dislike of [a]ppellant's being around his son and alleged mistreatment of his son. . . .
>
> . . . .
>
> . . . Put simply and bluntly, the two men were not fighting over Ms. Carr. They were fighting over [a]ppellee's son . . . .

The record, however, supports the trial court's finding that appellant's and appellee's relationships with Carr motivated appellant's violence against appellee. Appellee testified that during the incident at the soccer field, he and appellant exchanged verbal jabs about their romances with Carr. Specifically, appellant accused appellee of sleeping "on the couch for the last three months" of appellee's past relationship with Carr. Appellee responded by stating that he had "never slept on the couch unless [he had] chose[n] to," that he "had some video" (presumably of him and Carr together) if "[appellant] wanted to see it," and that Carr "didn't have to bring another guy over when [appellee]" was dating her. Appellant later testified that he had believed that Carr had been in her residence with another man, which prompted him to kick her door. Carr told appellee about the incident with the door, and appellee mentioned that incident during the altercation at the soccer field. Appellant testified that he was "kind of ticked off [that Carr] had told" appellee about the incident with the door.

10

Appellant explained that before appellee's statement about the videos that appellee had collected (or made) during his relationship with Carr, appellant was attempting to leave, but when appellee mentioned the videos, appellant and appellee "got nose to nose, *and that's when [appellant] lost [his] temper.*" [Emphasis added.] Appellant stated, "I'm tired of the texts *and everything that he sends her.* And, you know, he's mentioned [the videos] twice." He testified, "I didn't get upset *until [appellee] mentioned the videos.*" [Emphasis added.]

Thus, although appellant's and appellee's relationships with Gregory were subjects of part of their conversation at the soccer field, by appellant's admission, appellee's words about his prior relationship with Carr precipitated appellant's anger with appellee. We therefore conclude that under the standards described above, the evidence is legally and factually sufficient to prove that appellant committed violence "because of [appellee's] . . . dating relationship with . . . Carr." *See* Tex. Fam. Code Ann. §§ 71.0021(a)(1)(B), .004(3); *Martinez*, 977 S.W.2d at 334; *Garza*, 395 S.W.2d at 823. We overrule appellant's first issue.

**Likelihood of future violence**

The trial court concluded that family violence from appellant to appellee is likely to occur in the future. Appellant contends that this conclusion was erroneous. He argues that the fight at the soccer filed was an "isolated incident of violence, uncoupled from circumstantial evidence of any other incidents or behaviors." He also contends that appellee "initiated and maintained" the confrontation. He asserts,

11

No history of inappropriate, harassing, threatening, or violent conduct between the men . . . was presented . . . . But for [a]ppellee's approach of [a]ppellant at [Gregory's] soccer game, there is no reason to believe the two men . . . would have had *contact*, let alone an established fact pattern to support a finding of future family violence.

Appellee admitted that after the fight, appellant did not attempt to contact him. He testified that while he was concerned that appellant would act violently in the future, appellant had not done anything prior to the trial to indicate that he would do so. As appellee argues, the record does not show any prior incidents of violence between appellant and appellee.

In its thirty-eighth finding of fact, however, the trial court determined that appellant's repeated threats to kill appellee comprised "evidence that family violence is likely to occur in the future." Appellee's witnesses testified that appellant said many times that he would kill appellee and that he knew where appellee lived or could discover where he lived.[11] When appellee's counsel asked him whether he was concerned for his safety, he responded by stating, "Well, [when] a man tells you 20 times he's gonna kill ya, you need to listen."

We conclude that the trial court, which considered witnesses' descriptions of appellant's aggressive, out-of-control demeanor on the day of the fight (and before that when he kicked Carr's door) and viewed his demeanor at trial, could have reasonably found that he meant what he said on the day of the altercation: he intended to act violently in the future toward appellee just as he had on that

---

[11]In his brief, appellant does not acknowledge his threats to kill appellee.

occasion. *See Coffman v. Melton*, 448 S.W.3d 68, 74 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("Evidence of past violence can constitute sufficient evidence that future violence is likely."); *In re Epperson*, 213 S.W.3d 541, 544 (Tex. App.—Texarkana 2007, no pet.) ("Oftentimes, past is prologue; therefore, past violent conduct can be competent evidence which is legally and factually sufficient to sustain the award of a protective order."); *see also Collier v. State*, No. 12-13-00142-CV, 2013 WL 4769267, at *3 (Tex. App.—Tyler Sept. 4, 2013, no pet.) (mem. op.) (affirming a protective order when the evidence showed one act of physical violence coupled with explicit threats of future violence); *Johnson v. Johnson*, No. 13-12-00080-CV, 2012 WL 3525655, at *3 (Tex. App.—Corpus Christi Aug. 16, 2012, no pet.) (mem. op.) (holding that one act of violence plus evidence of the appellant's short temper justified a trial court's finding that family violence was likely to occur in the future).

Applying the appropriate standards, we hold that the evidence is legally and factually sufficient to support the trial court's finding that family violence is likely to occur in the future. *See* Tex. Fam. Code Ann. §§ 81.001, 85.001(a)(2); *Martinez*, 977 S.W.2d at 334; *Garza*, 395 S.W.2d at 823. We overrule appellant's second issue.

## Conclusion

Having overruled appellant's issues, we affirm the trial court's final protective order.

PER CURIAM

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

DELIVERED:  March 5, 2015