

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  | § |  |
| --- | --- | --- |
| TEXAS DEPARTMENT OF TRANSPORTATION A/K/A TXDOT, | § | No. 08-15-00045-CV |
| Appellant, | § | Appeal from |
| v. | § | 448th District Court |
| MARTINA JACKSON, INDIVIDUALLY AND ON BEHALF OF HER HUSBAND, | § | of El Paso County, Texas |
| KEITH JACKSON, DECEASED, AND CARLY ROSE JACKSON, AND | § | (TC # 2009-4329) |
| LARA MARIE JACKSON, | § |  |
| Appellees. | § |  |

## **O P I N I O N**

At just past midnight on a windy evening in El Paso, Keith Jackson was riding his motorcycle on U.S. Highway 54. As he took an exit ramp, he struck a Texas Department of Transportation sign that had blown onto the roadway. Sadly, Jackson was killed. In this case, we are asked to decide if Jackson's wrongful death beneficiaries presented legally sufficient evidence to support a jury finding in their favor that TxDOT knew or should have known of the hazard, and failed to take appropriate action as would any other landowner.

There is little dispute that on the night of the accident, TxDOT did not learn that the sign had blown onto the roadway in time to prevent Jackson's death. That same sign, however, was

broken nine days before and TxDOT tried to fix it, perhaps ineffectually. We view the question as whether notice of the hazard nine days earlier, coupled with some evidence of an ineffectual repair, satisfies the notice element for a premises defect claim. Concluding that there was legally insufficient evidence of notice, we reverse and render.

## FACTUAL SUMMARY

U.S. 54 is a multi-lane highway that runs north-south through El Paso. To mark the Diana Avenue exit, TxDOT installed a sign that sits just off of the roadway. The exit sign itself is approximately five feet by six feet. The sign is secured to two posts that extend to a concrete base. Each of the posts comes in two parts. The bottom part is called the "stub post" and it is bolted onto the concrete base. The top part of the post is affixed to the sign, and is called appropriately enough, the "sign post." Both the stub post and sign post are I-beams in their appearance, and at one end have a "fuse plate." The fuse plates have holes through which bolts will fit. The sign post connects to the stub post by placing the fuse plates together, aligning the holes, and securing the plates with four bolts.

The fuse plates are designed to break away if subjected to sufficient force, such as a vehicle striking the sign. This minimizes the risk of injury to a driver who runs into a standing sign. But the flip side of the design is that the sign becomes susceptible to damage from other forces, such as strong winds. The rated wind load for the sign post structure is 80 miles per hour.

A new sign was placed at the Diana exit in October 2008 after a motorist had struck the prior sign. Some six months later, on March 30, 2009, high winds broke a number of signs on U.S. 54. A TxDOT crew noticed that the Diana exit sign was not level and they stopped to inspect it. Two of the fuse plates on one of the leg posts had broken. The two broken fuse plates were on the same post, so the sign was still secured to the other leg post and was still standing

2

erect. The crew replaced all of the fuse plates as well as the nuts and bolts on the fuse plate assemblies. The TxDOT workers would have tightened the nuts and bolts on the fuse plates by hand using a wrench. A loose nut and bolt is a particular problem for highway signs. The constant vibration from road traffic and winds will cause a loose nut to become fatigued such that it can no longer provide sufficient clamping force to support the heavy highway signage.

For certain applications, TxDOT sign crews use a torque wrench to tighten nuts and bolts. A torque wrench allows the nut to be tightened to a specific numerical pressure setting. For instance, the bolts securing the stub post to the concrete base would have been tightened using a torque wrench to 200 inch pounds. But TxDOT policy does not require the use of a torque wrench for securing the fuse plates. Instead, the crew would hand-tighten the nuts with a wrench and then the leader of the sign crew would stand away from the sign to make sure it was sitting level. He would also check the level with a mechanical device as well. He believed that an un-level sign was the tell-tale indicator for any bolts not tightened down correctly. For the March 30, 2009 repair, the crew leader inspected the repaired sign and found it level.

The accident giving rise to this litigation occurred on April 9, 2009. At 12:01 p.m., a 911 operator received a call that a street sign was in the lane of traffic on the Diana exit ramp from U.S. 54. The downed sign was the same sign repaired some nine days earlier. The fuse plates on one of the posts had broken. The sign was therefore held up by only one post and in the high winds, the remaining post had twisted such that part of the sign had swung out and into the exit ramp. A TxDOT document estimated the winds were blowing forty to sixty miles an hour that night while National Weather Service data reported winds at 33 miles per hour at midnight.

Similar 911 calls reporting the downed sign were made at 12:03 p.m., 12:08 p.m., and 12:10 p.m. One caller prophetically warned that it was going to kill somebody if they ran into it.

3

Thirteen minutes after the first call, an animal control officer called to report Jackson's accident. A police officer arrived at the scene at 12:16 p.m. and found Jackson's motorcycle and later his body. Jackson was pronounced dead at the scene.

Jackson's wife and children filed suit against several entities, including TxDOT. By the time of trial, only TxDOT and a bolt seller, Screw Products, Inc., were still in the case. One of the Jacksons' theories against TxDOT focused on the repair to the sign nine days before Jackson's accident. They claimed that that the fuse plate nuts and bolts should have been tightened with a torque wrench, which allows for a specific torqueing pressure, rather than merely hand tightening the nuts and bolts with a wrench. The failure to do so, they claimed, prevented the two fuse plates from forming one monolithic structure. In that event, inordinate stress applied to one of the fuse plates causes it to fail.[1]

The Jacksons also pursued a claim against the Screw Products, Inc., whom they allege distributed the bolt. The Jacksons' expert opined that the bolt itself was defective, which caused it to fail. The expert specifically contended that a defect in the threads were such that the nut could not be sufficiently tightened to apply the correct clamping force.

The jury failed to find that bolt had been sold by the Screw Products, Inc., or that the bolt itself was defective (or if defective, that it was the producing cause of the accident). The jury did find that TxDOT was negligent and awarded substantial damages that the trial court reduced to $250,000 which is the statutory maximum that can be assessed against TxDOT for this claim. *See* TEX.CIV.PRAC.&REM.CODE ANN. § 101.023(a)(West 2011). The trial court overruled TxDOT's motion for directed verdict, and post-trial motion for judgment in its favor. Those

---

[1] The Jacksons also argued at trial that TxDOT could have done something more on the night of the incident with the thirteen minutes of potential notice time following the 911 call, but as we note below, the Jacksons have not carried that argument forward on appeal.

4

motions asserted in part that there was legally insufficient evidence to show that TxDOT had any notice of the defective sign in time to prevent this accident.

## DUTIES OWED BY TXDOT

A claim against TxDOT for a defect in highway signage requires us to explore both the law of sovereign immunity and premises liability. Sovereign immunity protects the State against lawsuits for money damages, unless the State has consented to suit. *See Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 655 (Tex .2008); *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004). TxDOT is a governmental entity protected by sovereign immunity. *See Tex. Dep't of Transp. v. Garza*, 70 S.W.3d 802, 806 (Tex. 2002). The Texas Torts Claim Act ("TTCA") establishes a limited waiver of this immunity, however, and authorizes suits to be brought against governmental units in certain narrowly-defined circumstances. TEX.CIV.PRAC.&REM.CODE ANN. § 101.021; *Tex. Dep't of Criminal Justice v. Miller*, 51 S.W.3d 583, 587 (Tex. 2001). Sovereign immunity includes two distinct principles, immunity from suit and immunity from liability. *Texas Dept. of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999). Immunity from liability is an affirmative defense, while immunity from suit deprives a court of subject matter jurisdiction. *Id*. The TTCA creates a unique statutory scheme in which the two immunities are co-extensive. *Miranda*, 133 S.W.3d at 224.

The TTCA waives those two immunities for claims based on a premises defect. *Miranda*, 133 S.W.3d at 225. Specifically, Section 101.021 provides:

A governmental unit in the state is liable for:

.    .    .

(2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

TEX.CIV.PRAC.&REM.CODE ANN. § 101.021. Generally, a governmental unit owes a claimant only the duty that a private person would owe to a *licensee* on private property, unless the claimant is paying for use of the property. *Id*. at § 101.022(a). A private landowner cannot injure a licensee through willful, wanton, or grossly negligent conduct and must also make safe a dangerous condition of which the owner is actually aware but the licensee is not. *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 237 (Tex. 1992).

The duty is different, however, when the case involves a "special defect." For special defects, the governmental unit owes the claimant the same duty as a private person would owe to an *invitee*. TEX.CIV.PRAC.&REM.CODE ANN. § 101.022(b); *Payne*, 838 S.W.2d at 237. The TTCA does not define a special defect, but instead "likens it to 'excavations or obstructions' that exist 'on' the roadway surface." *Denton County v. Beynon*, 283 S.W.3d 329, 331 (Tex. 2009), *quoting* Section 101.022(b). Whether a condition is a special defect is a question of law that we review de novo. *Texas Dep't of Transp. v. Perches*, 388 S.W.3d 652, 654-55 (Tex. 2012)*; Texas Dept. of Transp. v. York*, 284 S.W.3d 844, 847-48 (Tex. 2009). This case was submitted as a special defect and neither party claims otherwise on appeal.

Generally, a property owner owes an invitee a duty to use ordinary care to reduce or eliminate an unreasonable risk of harm created by a premises condition about which the property owner knew or should have known. *Payne*, 838 S.W.2d at 237; *Diez v. Alaska Structures, Inc.*, 455 S.W.3d 737, 742 (Tex.App.--El Paso 2015, no pet.). The Texas Supreme Court has provided a correct jury charge setting forth the elements in a special defect case. *State v. Williams*, 940 S.W.2d 583, 584-85 (Tex. 1996). *Williams* in fact involved a motorist who hit a sign in the roadway. *Id*. Parsing the holding in *Williams* to this case, a jury could only find TxDOT negligent for a special defect if the Jacksons proved:

6

a. the condition posed an unreasonable risk of harm;

b. TxDOT knew or reasonably should have known of the danger;

c. TxDOT failed to exercise ordinary care to protect the plaintiff from danger, by both failing to adequately warn plaintiff of the condition and failing to make that condition reasonably safe.

*See id*. at 584-85. The jury in this case was charged accordingly.[2]

The TTCA also contains something of an exception to the exception when the claim involves a governmental employee responding to an emergency. Section 101.055(2) provides that the waiver of sovereign immunity "does not apply to a claim arising . . . from the action of an employee while responding to an emergency call or reacting to an emergency situation if the action is in compliance with the laws and ordinances applicable to emergency action, or in the absence of such a law or ordinance, if the action is not taken with conscious indifference or reckless disregard for the safety of others . . . ." TEX.CIV.PRAC.&REM.CODE ANN. § 101.055(2). The Jacksons thus carried the burden to show that TxDOT employees were not responding to an emergency situation, and failing that, to show they did not follow some law or ordinance governing the repair of signage, or that the TxDOT acts or omissions were done with conscious indifference. *City of San Antonio v. Hartman*, 201 S.W.3d 667, 672 (Tex. 2006); *Tex. Dep't of Pub. Safety v. Little,* 259 S.W.3d 236, 238 (Tex.App.--Houston [14th Dist.] 2008, no pet.).

**STANDARD OF REVIEW**

In its first two issues, TxDOT contends that the Jacksons failed to raise legally sufficient evidence to show that TxDOT received actual or constructive notice of the condition, or if it did,

---

[2] We do note that the jury charge here also contained a general negligence definition. The comments to the Pattern Jury Charge contemplate that a general negligence definition might be included when other non-premises defendants are asked about in the same question. Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Malpractice Premises Products* PJC 66.4 (2014). This question, however, only asked about TxDOT and a premise defect theory is the only claim for which the TxDOT has even arguably waived sovereign immunity. The inclusion of the general negligence instruction was unnecessary at best.

7

that it had sufficient time to either warn or make the condition safe. These issues raise "no evidence" points guided by the familiar no evidence standard of review.

No evidence supports a jury finding when there is:

(a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact.

*City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005), *quoting* Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Tex.L.Rev. 361, 362-63 (1960). More than a scintilla of evidence exists when reasonable and fair-minded individuals could differ in their conclusions. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750-51 (Tex. 2003). There is not a scintilla of evidence when the evidence is so weak as to do no more than create a mere surmise or suspicion of material fact. *Wade Oil & Gas, Inc. v. Telesis Operating Co., Inc*., 417 S.W.3d 531, 540 (Tex.App.--El Paso 2013, no pet.). We view the evidence and possible inferences in the light most favorable to the verdict. *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 228 (Tex. 1990). If more than a scintilla of evidence supports the verdict, it must be upheld. *Garcia v. Ins. Co. of State of Pa.*, 751 S.W.2d 857, 858 (Tex. 1988)(per curiam).

TxDOT's third issue contends that the "emergency doctrine" exception applies which imposes a higher burden on the Jacksons, which is unmet on this record. The emergency doctrine was not raised below. Nonetheless, because sovereign immunity raises questions about our subject matter jurisdiction to hear this case, TxDOT may raise this issue for the first time on appeal. *See Rusk State Hosp. v. Black*, 392 S.W.3d 88, 95 (Tex. 2012). Here, the Jacksons do not claim that TxDOT violated any law or ordinance governing the emergency repair of signs, nor do they claim TxDOT acted with conscious indifference. Accordingly, this exception to the

TTCA would apply unless some evidence shows that TxDOT was not reacting to an emergency situation. *See City of San Antonio v. Hartman*, 201 S.W.3d 667, 672-73 (Tex. 2006).

## SPECIAL DEFECT

Assuming the hazard here was a special defect, the Jacksons were required to prove that TxDOT received actual or constructive notice of a condition that posed an unreasonable risk of harm and failed to exercise ordinary care to protect Jackson from that danger, by both failing to adequately warn of the condition and by failing to make that condition reasonably safe. *Williams*, 940 S.W.2d at 584-85. TxDOT's first two issues claim that there was at most a thirteen minute time interval between when the sign was first reported as down, and when the accident could have occurred. TxDOT was not notified within that thirteen minute interval, but even if had been, it could not have reasonably arrived at the scene, eliminated the hazard, or warned Jackson.

On appeal, the Jacksons do not directly contest that argument or its underlying factual premise. The accident occurred just at midnight, and although TxDOT has an office located about a half mile from the accident scene, the office was closed at the time. The employee who could have been called out after hours lived some ten to fifteen minutes away. Even at that, the 911 operator would have had to contact a TxDOT supervisor, who in turn would have had to contact that employee. The 911 operator would first send a police cruiser to the scene to assess the situation before the call was made to the TxDOT supervisor. The 911 operator did so here, but the responding officer arrived a few minutes *after* the accident. Accordingly, if notice of the hazard is measured from the events of April 9, 2009, we would agree that TxDOT did not know, and could not have known, of the downed sign. Viewing the evidence only through the prism of April 9, 2009, the evidence does not support the verdict.

9

The Jacksons, however, contend that notice should be measured from March 30, 2009, when a TxDOT sign crew inspected and found broken fuse plates on the same sign. On that day, the Jacksons contend that TxDOT had a duty to use ordinary care to make the condition reasonable safe. They claim that TxDOT failed in that duty by not torqueing the nuts on the fuse plate so as to apply sufficient clamping force. The failure to do so resulted in the fuse plates failing some nine days later. Further, on the date that the sign was repaired, there was no emergency invoking the emergency doctrine because the sign at that time was not in the roadway.[3] The Jacksons rely on the following evidence to support their argument that TxDOT did not use ordinary care to make the condition reasonably safe on March 30.

First, they rely on an admission from the TxDOT crew chief that the sign should not have failed within nine days of the fuse plates and bolts all being replaced:

Q: And signs that are designed and installed to withstand wind of 80 miles per hour, which this sign is, correct?

A: Yes.

Q: They should not come loose and break in nine days. Would you agree?

A: That's -- those are the specs.

Q: Well, you would agree that the bolts should not have come loose. The fuse plates should have -- the bolted connections should not have come loose in the nine days?

A: Yes.

The Jacksons' expert, mechanical engineer Michael Huerta, PhD, also testified that the failure within nine days was indicative of the bolts not being properly pre-tensioned. The sign

[3] Neither party addresses the implication of that argument on whether the broken sign on March 30 would still be considered a special defect. In *Denton County v. Beynon*, 283 S.W.3d 329 (Tex. 2009), the court held that a floodgate arm that was about three feet from the edge of a roadway was not a special defect. Whether on, or just off the roadway, conditions can be special defects only if they are like excavations or obstructions, and "only if they pose a threat to the ordinary users of a particular roadway." *Id*. at 331, *quoting State Dep't of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 238, n.3 (Tex. 1992). Here, we assume without deciding that the broken sign on March 30 was a special defect.

was designed to withstand winds of up to 80 mile per hour. A TxDOT report notes winds on April 9th as high as 60 miles per hour and weather data from that time period notes wind speeds ranging near 30 miles per hour with gusts around 40 miles per hour. According to the Jacksons, something other than merely wind speed must explain the sign's failure.

The Jacksons also rest their argument on what they describe as a Federal Highway Administration standard which requires nuts and bolts to be tightened to 37 foot pounds of pressure, to be verified by a torque wrench. They admitted excerpts of a FHA guideline which includes a table with torque values for "galvanized mild steel bolts." The document further states: "[t]hese fasteners should be installed to the torque value values shown in Table 4 [where the 37 ft/lb figure is found], and verified using a properly calibrated torque wrench." Dr. Huerta testified that the particular "A325" bolt at issue was a "galvanized mild steel bolt." A TxDOT representative testified that the FHA sets minimum standards for federally funded highways, such as U.S. 57.[4] The same document states that when "a bolted joint is not properly

---

[4] This testimony came in through Edgar Fino, who was TxDOT's designated representative at trial. Fino was called adversely, and then questioned about the FHA document which the Jacksons' trial lawyer said he had found the night before while searching the internet. Over a relevance objection, the trial court admitted what to us appears to be an excerpted portion of a larger FHA document. The current version of the document contains a Section 2.0, titled "Scope", which was not included with the exhibit. "Guidelines for the Installation, Inspection, Maintenance and Repair of Structural Supports for Highway Signs, Luminaries, and Traffic Signals" http://www.fhwa.dot.gov/bridge/signinspection02.cfm (noting the document applies to "traffic signal structures, overhead highway signs, highmast luminaries and other large light poles, and also supports used for traffic monitoring equipment of various types, such as cameras. . . . Wood poles and signs, concrete poles, and span wires are not directly addressed, though some of the information contained herein may assist in evaluating those structures."). The current version also contains omitted portion Section 6.4, "Installation of Bolts and Fasteners", which describes five different methods for securing A325 fasteners. *Id.* ("For high strength bolted joints using ASTM A325 galvanized bolts, allowable methods of installation, to develop the required pretension, include the turn-of-nut method, calibrated wrench method, twist-off-type tension-control bolt method, or direct-tension-indicator method. These are described in Section 8 of the RCSC Specification. Procedures for each installation method are detailed in report FHWA-SA-91-031, High Strength Bolts for Bridges, Appendices A2 through A6. A detailed coverage of high strength bolting may also be found in the Steel Structures Technology Council (SSTC) Structural Bolting Handbook."). The FHA document we reference was last revised on June 2, 2015. It is unclear how the document might have read either at the time of trial, or at the time this sign was installed. Fino later testified that the FHA document is just a guideline, and that TxDOT's standards, which do not require torque wrenches for fuse plates, has been approved by the FHA.

pretensioned, all the load range is transferred through the bolts and they may quickly fail by fatigue."

Dr. Huerta provided similar testimony, stating that a properly torqued nut and bolt combination would almost never fail. Not verifying the amount of torque would be analogous to airing up a car tire without using a pressure gauge to verify the tire pressure. He also testified that upon inspection of the sign after the accident, he noticed some of the bolts were loose. He identified a black powder, formed by the process of "fretting", which he claimed was an indication the bolts were loose. He further testified that the TxDOT foreman's method of checking for bolt tightness--visual inspection of the level of the sign--was "not a good test." An expert for the bolt distributor, Dr. William Stafford, also agreed that the bolts had come loose because of the service condition they were exposed to. Dr. Stafford testified that the bolt he inspected showed deterioration due to looseness. He described the damage on the bolt as indicative of a gradual loosening of the assembly.

TxDOT does not contest any of this evidence on appeal, other than to suggest that it is irrelevant to a premises condition case.[5] The linchpin of TxDOT's argument are four Texas Supreme Court cases that it cites for the proposition that an unreasonably dangerous condition must be measured at the time of the injury, and not some antecedent situation that produced the condition. The cases include: *Fort Brown Villas III Condo. Ass'n, Inc. v. Gillenwater*, 285 S.W.3d 879 (Tex. 2009)(per curiam); *Brookshire Grocery Co. v. Taylor*, 222 S.W.3d 406 (Tex. 2007); *CMH Homes, Inc. v. Daenen*, 15 S.W.3d 97 (Tex. 2000); *City of San Antonio v.*

---

[5] In a footnote in its reply brief, TxDOT notes the apparent contradiction in Dr. Huerta's testimony where in one breath he claims TxDOT was negligent in not using a torque wrench to properly tighten the nut and bolt, and in the next claims that a defect in the bolt prevented it from being properly tightened. Dr. Huerta's only evidence of a defect in the bolt was a "fracture" he saw along the bolt threads of one bolt (and not present in the other bolts removed from the sign), and the fact the nut was binding when they tried to remove it. Huerta conceded that the bolt could have been damaged after the accident when the nut was forcibly removed and Dr. Stafford attributed the "fracture" to that process alone. The jury could have accordingly discounted Dr. Huerta's product defect testimony, but believed his testimony about the need for a torque wrench.

12

*Rodriguez*, 931 S.W.2d 535 (Tex. 1996). TxDOT contends the trial evidence would only be germane to a simple negligence claim, which is not actionable under the TTCA. Given the positions of the parties, we view this appeal first rising or falling on these four cases, and whether we can consider the premises defect as it existed nine days before the actual accident as notice of the dangerous condition. Accordingly we turn our attention to each of those decisions.

In *Brookshire Grocery Co. v. Taylor* a customer slipped from melting ice on the floor that came from a self-service soda dispenser. 222 S.W.3d at 407. The customer claimed the machine itself, which led to ice falling to the floor on a daily basis, was the dangerous condition. *Id.* The store was aware of the propensity of ice to fall on the floor and had put out some, but perhaps not enough floor mats to remedy the situation. Conversely, the store contended the unreasonable condition was the ice that fell to the floor just before the customer's slip and fall of which it had no notice. The court agreed with the store, noting that "[o]rdinarily, an unreasonably dangerous condition for which a premises owner may be liable is the condition at the time and place injury occurs, not some antecedent situation that produced the condition. *Id.* at 407. Nonetheless, we find *Taylor* is not controlling here. The court in *Taylor* emphasized that there was no evidence that the soft drink dispenser itself was defective or that it was "set up in such a way that ice on the floor was a greater danger than one would ordinarily encounter with such a dispenser." *Id.* at 408. Here, however, there was some evidence that the sign itself was the problem. There was some evidence that the sign, as repaired on March 30, was not secured as it should be, and was at greater risk of failure in the future. But while *Taylor* is not dispositive, the cases it relies on prove more problematic for the Jacksons.

In *City of San Antonio v. Rodriguez,* the plaintiff was injured while playing basketball at a city gym. He slipped in a puddle of water that collected on the basketball court from a leaky

roof. 931 S.W.2d at 536. The leaky roof was known by the city, but the water on the floor was not. *Id.* The judgment was reversed due to a defective charge but the court also addressed the city's claim that it was entitled to judgment as a matter of law. The court agreed that "[t]he leaky roof was not itself a dangerous condition; it could only cause a dangerous condition," and that "[t]he City was not required to warn of leaks in the roof or repair them; it was required only to prevent the water that leaked through the roof from causing a dangerous condition." *Id.* at 536. Under that logic, TxDOT's improperly repaired sign on March 30 was not the dangerous condition, but only an antecedent situation that might require TxDOT to respond in the future when another windstorm further damaged the sign. But the *Rodriquez* court rejected the City's argument that its lack of knowledge of the water on the floor absolved it of all fault. The court remanded the case for trial because there was some evidence that the person in charge of the facility actually knew of the leaking roof and that it had been raining. From this, a jury might infer the person in charge actually knew that there would be water on floor. *Id.* For that reason, *Rodriquez* does not compel a rendition for TxDOT. We still must ascertain whether there is evidence that TxDOT knew or should have known of the risk to motorist following the March 30 repair.

For that question, we find *CMH Homes, Inc. v. Daenen* to be controlling. In *CMH Homes*, a delivery man was injured when a platform he was using became unstable; the platform had a history of becoming unstable over time with regular use, and occasional impacts by those making deliveries. 15 S.W.3d at 98. Prior to the delivery man's injury, the platform had been last been repaired some twelve to fifteen months earlier. *Id.* The court rejected the argument that the platform was unreasonably dangerous merely because the premises owner knew it would eventually become unstable with use. "Many building materials will, over time, deteriorate and

14

require repair or replacement. That does not necessarily mean that the owner or occupier has created a dangerous condition or that the owner has actual or constructive knowledge of a dangerous condition." *Id*. at 101. The court agreed that there may be situations in which the deterioration of a structure or fixture is so rapid that there is an unreasonable risk of harm from the outset of its construction or installation, but this case did not present such a situation. *Id*.

The *CMH Homes* court assumed that the premises owner had actual knowledge that the platform would become unstable and lead to an unreasonable risk of injury after twelve to fifteen months simply by virtue of its use. *Id*. at 100-01. The court also assumed the premises owner knew the platform could immediately become unstable if hit and damaged by a truck, which could happen at any time. *Id*. By the same token, we assume here that TxDOT might know that bolts can become loosened over time with normal highway and weather conditions, or that its signs might fail more rapidly in more unusual high wind conditions. The question in *CMH Homes*, like in this case, is how must a premises owner guard against such long-term or potentially short-term failures.

The rationale of *CMH Homes* turns on a core duty of a property owner--the duty to inspect for dangerous conditions. The invitee in *CMH Homes* would have been entitled to recover "if a reasonable inspection would have revealed that the unit was no longer safe." *Id*. at 102. There was no evidence in that case that the platform was a dangerous condition from its inception or that a reasonable inspection would have shown it to be unstable. *See also Fort Brown Villas III Condo. Ass'n, Inc. v. Gillenwater*, 285 S.W.3d 879 (Tex. 2009)(noting no evidence of improper inspection of chairs or that defect would have been seen on inspection).

Here, we are faced with some evidence challenging whether TxDOT performed a reasonable inspection, but we have nothing but speculation as to what some other inspection

regime would have shown in the nine days between the repair and the second failure of the sign. TxDOT crews drive the freeway daily and visually inspect their signs. Under that policy, each sign should be visually inspected at least twice a week. TxDOT contended that the visual inspection would show any loose bolts, and that is how the broken fuse plates on March 30 were in fact discovered. The Jackson's expert, however, provided some evidence criticizing this method, but we are unclear what compliance with the expert's standard would have shown at any time before Jackson's accident.

Dr. Huerta claimed that the FHA's 37 foot pound torqueing pressure was a minimum standard and he would have gone "higher." We assume he contends that a proper inspection regime would require use of a torque wrench set to test for some specific pressure setting, but the Jacksons never elicited evidence of what that kind of inspection would have shown, and when it should have been conducted. For instance, if a TxDOT employee applied a torque wrench to the fuse plates bolts on April 1, 2009, there is no evidence in this record that it would not have shown 37 foot pounds. There was no evidence as to what the torque rating of the nuts and bolts were after the accident, and for one of the bolts, the nut was binding on the bolt to such an extent that it had to be forced off. The experts used the term "loose" but by never quantifying what they meant by loose, the jury was left to speculate how their use of that term relates to the quantifiable torque rating the Jacksons claim was required for these nut and bolts, and presumably would be used in their suggested inspection regime.

The time gap between repair of the platform in *CMH Homes* and its failure was twelve to fifteen months. The time gap in this case is nine days. But whether the time gap is nine days, nine week, or nine months, the same rule of law should apply. TxDOT was under a duty to reasonably inspect the sign, even after it believed it had properly repaired the sign on March 30.

16

We agree that the Jacksons presented some evidence that TxDOT's visual inspection method may have been flawed, but they presented no evidence of what a proper inspection would have shown. Because *CMH Homes* requires that showing, we agree that there is no evidence that TxDOT had notice after March 30, 2009 of a dangerous condition of the sign. We also agree that TxDOT had no notice that the sign had failed on April 9, 2009 until after Jackson's accident and therefore it had no opportunity to remedy or warn of the situation. We accordingly sustain Issues One and Two and need not address the emergency doctrine question, raised in Issue Three. We reverse and render judgment in favor of TxDOT.

February 15, 2017

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Hughes, JJ.
Hughes, J., not participating

17