**Reversed and Remanded and Opinion Filed December 29, 2022**



In The
**Court of Appeals**
**Fifth District of Texas at Dallas**

_____

**No. 05-21-00375-CV**
_____

**INDEPENDENT BANK, FORMERLY KNOWN AS UNITED
COMMUNITY BANK, N.A., Appellant/Cross-Appellee**
**V.**
**JOHN C. GANTER, Appellee/Cross-Appellant**

**On Appeal from the 298th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-12-13675**

## MEMORANDUM OPINION

Before Justices Myers, Carlyle, and Goldstein
Opinion by Justice Myers

Independent Bank and John C. Ganter appeal the trial court's judgment

awarding Ganter damages of $218,147.83, as well as interest and attorney's fees.

Independent Bank brings seven issues on appeal contending the trial court erred by

(1) granting Ganter's traditional motion for summary judgment; (2) denying the

Bank's traditional and no-evidence motions for summary judgment; (3) sustaining

Ganter's objections to the Bank's summary judgment evidence; (4) overruling the

Bank's objections to Ganter's summary judgment evidence; (5) awarding Ganter

damages in an amount unsupported by the summary judgment evidence; (6)

awarding Ganter attorney's fees, and (7) failing to award the Bank its attorney's fees. Ganter brings three cross-issues on appeal contending the trial court abused its discretion by (1) and (2) wrongly interpreting ratification and release language in the Loan Modification Agreements, and (3) sustaining some of the Bank's objections to Ganter's summary judgment evidence. We reverse the trial court's judgment and remand the cause for further proceedings.

## BACKGROUND

This case concerns a financial real estate investment plan affected by the 2008 real estate market crash.

Ganter's son, Chris Ganter, started a real estate business called CDG. In 2007, CDG bought twenty-two unfinished townhome lots in Allen, Texas. CDG found investors for the lots. The plan was that the investors would obtain short-term construction loans from the bank to purchase the lots from CDG and finish construction of the townhomes. After the construction was completed, the investors would refinance the loans with other institutions at lower interest rates and then rent out the townhomes for a profit. Chris found eight investors who obtained loans from the bank pursuant to this plan.[1]

Ganter and Chris executed limited guaranties of the eight investors' loans from the Bank. Each of the eight guaranties stated:

---

[1] The investors' notes and other loan documents are not in the record. The guaranties signed by Ganter state the amount of the investors' loans and their effective date, but nothing shows the original maturity dates of the loans.

–2–

My [Ganter's] liability will not exceed [a stated amount from $32,000 to $64,000] of the principal amount outstanding at default, plus accrued interest, attorneys' fees and collection costs when allowed by law, and all other costs, fees and expenses agreed to be paid under all agreements evidencing the Debt and securing the payment of the Debt. You [the Bank] may, without notice, apply this Guaranty to such Debt of the Borrower as you may select from time to time.

Ganter's limited guaranties totaled $352,000, and Chris guaranteed up to $95,000 of the eight investors' loans for combined guaranties of up to $447,000.

In 2008, the real estate market crashed. Although the investors had each been approved for a refinance loan before the real estate market crash, the refinancing lenders were not willing to make the loans after the crash.

In October 2008, Ganter, his wife, and Chris opened a demand deposit account (DDA) at the bank. They used the account to make payments to the bank concerning the loans in this case as well as on other personal loans Chris had with the bank. None of the investors personally paid any amount toward the loans. The only payments were made by the Ganters from the DDA.

Chris testified that he authorized the bank to make withdrawals from the DDA, but he testified that he "never agreed or authorized or directed the Bank to pay down the Townhome Loans any amount in excess of our guarantees." At least some of the townhomes were completed and were rented. The Ganters collected the rent payments and put them in the DDA. The rent payments were not sufficient to pay amounts due under the loans.

When the investors' loans matured, the bank would renew and extend the loans and the guaranties.[2] In 2011, most of the investors and the Ganters signed loan modification agreements (LMAs). The LMAs modified and extended the maturity date of the loans from May 13, 2011 to July 15, 2012. To the extent the loans may have been in default before the LMAs, the LMAs restored each loan to performing status. The LMAs also contained ratification and release-of-lender provisions. Ganter signed the latest LMA on May 13, 2011.[3]

After the LMAs were signed, the investors did not make any payments on the loans from their own accounts. The only payments came from withdrawals the bank made from the DDA. However, those payments were not sufficient to meet the payment requirements. Eventually, the bank either foreclosed on the properties or it approved short sales of the properties. These sales did not cover all amounts owed on the loans, and the bank represented that its losses on the loans exceeded the $447,000 Ganter and Chris had guaranteed.

On October 31, 2011, at the bank's and Chris's suggestion, Ganter entered into a line of credit with the bank for up to $450,000 to pay the obligations on the guaranties. Ganter pledged stock and a certificate of deposit as collateral for the line of credit. After the foreclosures and short sales of the properties, the bank drew

---

[2] The record does not include the extensions before the 2011 Loan Modification Agreements, so nothing shows the date or length of the extensions or when the investors' notes came due after the extensions.

[3] One investor, Snelson, did not sign LMAs. That does not affect the outcome of this appeal.

$302,249.71 from the line of credit. Ganter did not make any payments on the line-of-credit loan, and the bank foreclosed on the collateral selling the stock for $306,284.36, and liquidating the certificate of deposit for $43,970.42, for total funds of $350,254.78.[4]

Ganter sued the bank alleging he had fully paid the limited guaranties by making payments from the DDA before the bank foreclosed on his stock and certificate of deposit. He alleged the bank was liable to him for fraud, negligent misrepresentation, breach of contract, quantum meruit, money had and received, and defamation, and he requested declaratory judgment and injunctive relief. The bank counterclaimed, alleging Ganter had breached the line-of-credit agreement. The bank sought its attorney's fees but did not request damages on its claim. The parties moved for summary judgment. The trial court granted the bank's motions for summary judgment and awarded it attorney's fees of almost $154,000.

On the first appeal of this case, we reversed the summary judgment on the bank's claim for breach of contract and on Ganter's claims for breach of contract, quantum meruit, negligent misrepresentation, money had and received, and most of the requested declaratory relief. *See Ganter v. Indep. Bank*, No. 05-15-00413-CV, 2016 WL 4376284, at *1 (Tex. App.—Dallas Aug. 16, 2016, pet. denied) (mem. op.). We concluded there was more than a scintilla of evidence that more than

---

[4] The record does not show how much, if any, of the proceeds from the stock and the certificate of deposit were returned to Ganter.

$453,000 was paid toward the guaranties from the DDA by July 2010, and more than a scintilla of evidence that the bank drew over $302,000 on the line-of-credit loans to pay the guaranties when the guaranties were limited to $447,000. We remanded the case to the trial court for further proceedings. *Id.*

Back in the trial court, the bank moved for a no-evidence and traditional summary judgment on Ganter's causes of action. Ganter nonsuited his claims for negligent misrepresentation and money had and received, leaving only his claims for quantum meruit, breach of contract, and declaratory judgment. The parties objected to each other's summary judgment evidence, and the trial court made rulings on those objections. The trial court granted the bank's motion for summary judgment in part, including dismissing the quantum meruit cause of action.[5] The court made conclusions of law that the release and ratification provisions in the LMAs executed in May 2011 were unambiguous and that they released Ganter's claims for overpayment from before the LMAs and provided that Ganter's obligations under the guaranties were not extinguished but remained in full force and effect and continued to guarantee the payment of the notes as of the effective date of each LMA. In other words, on May 13, 2011, the effective date of the LMAs, Ganter owed the full amount of each guaranty and had no claim for overpayments from any payments he made before the LMAs.

---

[5] Ganter does not appeal the dismissal of the quantum meruit cause of action.

–6–

After the trial court's ruling on the bank's motion for summary judgment and the court's conclusions concerning the continuing validity of the guaranties, Ganter moved for summary judgment on his cause of action for breach of contract. Ganter asserted he had made payments to the bank after the effective dates of the LMAs, May 13 and 25, 2011, exceeding the $447,000 limitation on the guaranties. The parties again objected to each other's evidence, and the court ruled on those objections, including sustaining all of Ganter's objections to the bank's summary judgment evidence. The trial court granted Ganter's motion for summary judgment. The trial court's final judgment awarded Ganter damages of $218,147.83 for the bank's breach of contract, as well as pre- and post-judgment interest and attorney's fees.

## SUMMARY JUDGMENT

The bank's first and second issues contend the trial court erred by granting Ganter's motion for summary judgment and denying its motion for summary judgment.

We review a no-evidence summary judgment under the same legal sufficiency standard used to review a directed verdict. *See* TEX. R. CIV. P. 166a(i); *Flood v. Katz*, 294 S.W.3d 756, 762 (Tex. App.—Dallas 2009, pet. denied). We must determine whether the nonmovant produced more than a scintilla of probative evidence to raise a fact issue on the material questions presented. *See id.* When analyzing a no-evidence summary judgment, we consider all the evidence in the light

–7–

most favorable to the nonmovant, we indulge every reasonable inference, and we resolve any doubts against the movant. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006) (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005)). A no-evidence summary judgment is improperly granted if the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). "More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable, fair-minded persons to differ in their conclusions." *Id.* (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *Id.* (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

In a traditional summary judgment, the movant has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). In deciding whether a disputed material fact issue exists precluding summary judgment, evidence favorable to the nonmovant will be taken as true. *In re Estate of Berry*, 280 S.W.3d 478, 480 (Tex. App.—Dallas 2009, no pet.). Every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in its favor. *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005).

We review a summary judgment de novo to determine whether a party's right to prevail is established as a matter of law. *Dickey v. Club Corp.*, 12 S.W.3d 172, 175 (Tex. App.—Dallas 2000, pet. denied).

When both parties move for summary judgment on the same issue, and the trial court denies one motion but grants the other, we review both motions and responses, we consider the evidence presented by both parties, we determine all questions presented, and we render the judgment the trial court should have rendered. *Nettye Engler Energy, LP v. BlueStone Nat. Res. II, LLC*, 639 S.W.3d 682, 689 (Tex. 2022); *Barbara Techs. Corp. v. State Farm Lloyds*, 589 S.W.3d 806, 811 (Tex. 2019).

## Ganter's Motion for Summary Judgment

In its first issue, the bank contends the trial court erred by granting Ganter's motion for summary judgment.

Ganter presented a traditional motion for summary judgment on his cause of action for breach of contract. That cause of action alleged the bank breached Ganter's limited guaranties "when it continued to apply [Ganter's] personal funds to the Allen Townhome loans in excess of the amounts stated in the Limited Guarantees."

The parties' dispute concerns what was limited in the guaranties and what was fully guaranteed, the meaning of the "Ratification" and "Release of Lender"

–9–

provisions in the LMAs, and how the bank should have allocated payments from the Ganters.

The first dispute is what liability under the guaranties was limited to $447,000. According to the bank, the language of the limitation provision meant the Ganters' liability for the loans' principal was limited to $447,000 but that there was no limitation on guaranties of interest and other charges. According to Ganter, the limitation was a limitation on the total amount he and Chris owed under the guaranties, and he argued that his and Chris's liability under the guaranties ceased when they had paid the bank $447,000 toward the loans regardless of whether the bank allocated the payments to principal, interest, other charges, or expenses.

The second dispute concerns allocation of the payments. According to the bank, some of the payments were made by the Ganters as agent of the investors and therefore should be counted as payments by the investors on the notes and not payments under the guaranties. According to Ganter, he and Chris were not the investors' agents, and any payment he or Chris made, including all payments from the DDA, was a payment made pursuant to their obligations under the guaranties.

The third dispute concerns the meaning of the ratification and release-of-lender provisions in the LMAs. According to the Bank, the ratification provisions essentially "reset" the notes and guaranties as if no payments had been made under either the notes or the guaranties, and the Ganters released any claims or defenses they had for payments or overpayments on the guaranties. According to Ganter, the

–10–

ratifications and releases in the LMAs did not reset the notes and the guaranties to their original values and did not release his claims and defenses of payment.

Ganter's theory of the case is that he and Chris guaranteed up to a total of $447,000 and that all payments from the DDA counted toward the guaranties. He argues the payments from the DDA exceeded $447,000 both before and again after the LMAs. Therefore, Ganter argues, he owed nothing on the guaranties when the bank drew on the line of credit, and the bank had no right to draw on the line of credit except to fulfill the guaranties. Thus, he asserts the bank's foreclosure of the collateral on the line of credit was wrongful and that the bank breached the guaranties by taking more than $447,000 from the DDA and the line of credit.

The bank's theory of the case is that the only payments from the DDA that counted toward the guaranties were those that the bank allocated toward payment under the guaranties and toward payment of principal. The bank determined that some of the Ganters' payments were made in the role of agents for the investors and therefore did not count as payments by the Ganters on the guaranties. The bank also determined that any payments pursuant to the guaranties that were for interest or other expenses did not reduce the amount of the limitation on principal. The bank also argued that the ratification and releases in the LMAs released it from all liability for the Ganters' payments made before the LMAs and reset the guaranties as if no payments had been made toward the limitation in the guaranties.

The trial court's rulings on the motions for summary judgment demonstrate that the trial court agreed with Ganter that the limitation in the guaranties applied to all payments the Ganters made under the loans and that all payments were made pursuant to their liability under the guaranties and not as agents of the parties. The trial court's conclusions of law concerning the release-of-lender and ratification provisions in the LMAs show the trial court agreed with the bank that the LMAs reset the guaranties and released the bank from any claims or defenses by Ganter of having paid all or part of the guaranties before the LMAs. The trial court applied these interpretations to the evidence and determined the bank took from Ganter $218,147.83 more than he owed under the guaranties.

*Payments Counting Toward the Limitations on the Guaranties*

We must first consider whether the trial court correctly determined that all payments made by the Ganters after the LMAs counted toward the limitations on the guaranties.

The guaranties were identical except for their effective date, the identity of the borrower, the account number, the amount borrowed, and the amount guaranteed. For example, Ganter's 2007 guaranty of Julho Kara's loan provided that Ganter promised "payment and performance of each and every Debt." The guaranty identified, "A promissory note or other agreement, No. 3563, dated July 13, 2007, from Julho J. Kara (Borrower) to you [the bank], in the amount of $320,000."

In the guaranties, Ganter stated, "I absolutely and unconditionally agree to all terms of and guaranty to you the payment and performance of each and every Debt . . . including without limitation all principal, accrued interest, attorneys' fees and collection costs . . . ." "Debt" also included all obligations of the Borrower to the bank, including amounts to be paid under the terms of any notes as well as advances for taxes, insurance, and repairs. Thus, under the guaranty, Ganter guaranteed payment of all principal, interest, or other amount that the borrower had promised in the note to pay the bank as well as any other expenses the bank incurred relating to the loan. The guaranty then provided a limitation on Ganter's liability under the guaranty:

> My liability will not exceed $32,000.00 of the principal amount outstanding at default, plus accrued interest, attorneys' fees and collection costs, when allowed by law, and all other costs, fees and expenses agreed to be paid under all agreements evidencing the Debt and securing the payment of the Debt. You may, without notice, apply this Guaranty to such Debt of the Borrower as you may select from time to time.

The parties' disagreement over the interpretation of the limitation provision concerns the phrase, "[m]y liability will not exceed $32,000 of the principal amount outstanding at default, plus accrued interest, [etc.] . . . ." Ganter argues the $32,000 limitation applies to the entire guaranteed amount, that is, the most Ganter will be liable to the bank under this guaranty is $32,000. The bank argues the limitation applies only to the amount "of the principal outstanding at default," and that Ganter's guaranty is unlimited as to the amounts of "accrued interest, attorneys' fees and

–13–

collection costs," etc. In other words, the dispute is whether the "plus" items are part of the $32,000 limitation, or whether they are amounts guaranteed that are not subject to the limitation.

We agree with the bank. The provision provides that Ganter's liability "will not exceed" and is followed by a list of items. The commas in the sentence separate the different items in the series of things for which Ganter's liability "will not exceed." The first of those items is "$32,000 of the principal amount outstanding at default." That phrase is followed by a comma, the word "plus," and additional items separated by commas. "Plus" is an item of mathematical expansion, and in this case indicates additional items constituting what "my liability will not exceed." Therefore, the items following "plus" are items in addition to the first item, "$32,000 of the principal amount outstanding at default." Thus, the only "Debt" subject to the limitation in the guaranties is "the principal amount outstanding at default." The "accrued interest, attorneys' fees and collection costs," etc., are not subject to the $32,000 limitation but are guaranteed "unconditionally."

Ganter's incorrect interpretation of the guaranty was critical to his summary judgment argument that he had paid the bank more than he owed on his guaranties. Under the correct interpretation of the guaranties, Ganter must prove he fulfilled the guaranty by having paid the limitation amount on the principal, that he also paid the outstanding interest, etc., and that the bank continued to draw from the DDA and the line of credit and foreclosed on the stock and certificate of deposit after Ganter had

fully performed under the guaranty. Ganter has not made that showing in this case, so the trial court erred by granting Ganter's motion for summary judgment.

Even if Ganter's interpretation of the limitation provision was correct, there is a genuine issue of material fact that bars summary judgment in this case. That fact question is whether the Ganters made all their payments as guarantors, or whether they made some of the payments on behalf of the investors as their agents. Ganter argues that all payments from the DDA counted as payments by him and Chris as guarantors. The bank argues that many of the payments were made by Chris as agent of the investors to fulfill their obligations under the notes. Christopher Newtown, the bank's officer handling collection on the loans, testified these payments were not made under the guaranties and did not apply to the limitation on the Ganters' guaranties. Newtown testified at a temporary injunction hearing, which was included in the summary judgment evidence, that the bank renewed the investors' promissory notes when the documentation of the loans was brought current and payments were made. He then testified:

Q. Who paid the payments?

A. Funds directed to the bank by Chris Ganter.

Q. So it's your testimony that Chris Ganter paid the bank for the borrowers?

A. Yes.

Q. And who accepted these payments on behalf of the borrowers? . . . .

A. I was the loan officer.

So you accepted these payments on behalf of the borrowers?

A. I accepted funds that were paid to the bank to be applied to a series of loan payments.

. . . .

Q. And those came from Chris Ganter?

A. Yes.

Q. And the bank didn't apply them against his guaranty?

A. No.  Why would you?

Q. Why would the bank apply them against the borrowers' obligation? Is Mr. Ganter—

A. Because he was acting as agent for the borrowers.

Q. So Mr. Ganter, according to your understanding, was acting as an agent for the borrowers and paying his money against the borrowers' obligations?

A. Yes.

Q. Did he ever tell you that?

A. Sure.  Over two years.

Chris, however, provided contrary testimony.  Chris stated in his affidavit, "I was never an agent of any of the Borrowers.  I never agreed to act as their agent."[6]

Chris's and Newtown's conflicting testimony raises a fact question as to which payments were made by the Ganters as payments on the loans on behalf of the investors, and which payments were made as guarantors and applied to the

---

[6] The bank objected to Chris's testimony that he was not an agent for the borrowers as being a legal conclusion.  The trial court overruled this objection.  On appeal, the bank does not assert this ruling was error.

limitation on the guaranties to the extent the payments were for principal. This conflict makes it impossible to determine from the evidence before us whether the bank took more money from Ganter than it was entitled to take under the guaranties, and whether the bank was entitled to draw on the line of credit and foreclose on the stock and certificate of deposit when Ganter failed to repay the line of credit.

We sustain the bank's first issue.[7] Having sustained this issue, we need not address the bank's fifth issue contending the damages awarded Ganter were not supported by the summary judgment evidence.

### The Bank's Motion for Summary Judgment

In its second issue, the bank contends the trial court erred by denying the bank's motion for summary judgment. The bank asserts Ganter had no evidence, and that the evidence establishes as a matter of law that Ganter did not pay anything on the guaranties toward the principal between the effective date of the LMAs in May 2011 and when the bank drew on the line of credit on October 31, 2011. The bank points to the bank records of the DDA, which show no outgoing payments during that time. However, summaries of the loan records created by the Ganters show the bank received payments of principal and interest during that time. The bank asserts those payments were "regular monthly payments, broken out by

---

[7] The bank also argues there were numerous other factual and legal issues barring Ganter's entitlement to summary judgment. Having determined the trial court erred by granting Ganter's motion for summary judgment because Ganter incorrectly interpreted the guaranty and because there is a genuine issue of material fact whether any of the payments the bank received from the Ganters were as agents of the investors, we need not consider those other factual and legal issues in this appeal. *See* TEX. R. APP. P. 47.1.

principal and interest, which could not have been payments by [Ganter] reducing his personal guarantees of principal as a matter of law." There is evidence that the only payments on the loan were made by the Ganters from the DDA. Additionally, as discussed above, there is conflicting evidence of whether the payments were made by the Ganters as guarantors of the loans or whether they made the payments as agents for the investors to make their loan payments. Reviewing the evidence in the light most favorable to Ganter, there is some evidence that the Ganters made payments on the principal, and the evidence does not conclusively establish that the Ganters made no payments on the guaranties toward principal during that time.

We conclude the bank has not shown the trial court erred by denying the bank's motion for summary judgment. We overrule the bank's second issue.

## SUMMARY JUDGMENT EVIDENCE

In its third issue, the bank contends the trial court erred by sustaining Ganter's objections to the bank's summary judgment evidence. In its fourth issue, the bank contends the trial court erred by overruling the bank's objections to Ganter's summary judgment evidence. Ganter argues in his third cross-issue[8] that the trial court erred by sustaining some of the bank's objections to Ganter's evidence in support of Ganter's motion for summary judgment.

---

[8] This is Ganter's seventh "Issue Presented on Appeal" in his Brief of Appellee/Cross-Appellant, but it is the third of his issues contending the trial court erred.

–18–

Much of the summary judgment evidence involved in the parties' objections does not concern the genuine issue of material fact of whether the payments by the Ganters were made in their capacity as guarantors of the notes or in their capacity, if any, as agents of the investors. Those rulings do not affect the outcome of the appeal, and the resolution of the parties' arguments is not necessary to the disposition of the appeal. Accordingly we do not reach these issues. *See* TEX. R. APP. P. 47.1.

However, one piece of evidence may affect that determination—Chris Ganter's spreadsheets summarizing the loan histories. On appeal, the bank argues this evidence was inadmissible because Ganter did not disclose them and the documents underlying them in discovery. However, the bank did not make this argument before the trial court. There, the bank argued that the summaries did not meet the requirements for a summary of evidence under Rule of Evidence 1006 and because Chris Ganter was not an expert in interpreting bank records. The bank does not assert these objections on appeal. "To preserve an error for appeal, a party's argument on appeal must comport with its argument in the trial court." *Knapp v. Wilson N. Jones Mem'l Hosp.*, 281 S.W.3d 163, 170 (Tex. App.—Dallas 2009, no pet.). Because the bank's argument on appeal does not comport with its objections at trial, no error is preserved.

We overrule the bank's fourth issue to the extent the bank asserts the trial court erred by denying the bank's objection to Chris Ganter's summaries of the loan

histories. Otherwise, we do not address the bank's third and fourth issues and Ganter's third cross-issue. *See* TEX. R. APP. P. 47.1.

## ATTORNEY'S FEES

In its sixth issue, the bank contends the trial court erred by awarding Ganter his attorney's fees. Having reversed the award of damages to Ganter, we must also reverse the award of attorney's fees. *See Stutz Road Ltd. P'ship v. Weekley Homes, L.P.*, No. 05-13-01752-CV, 2015 WL 6747445, at *11 (Tex. App.—Dallas Nov. 4, 2015, no pet.) ("Because we reverse the trial court's awards of damages in this case, we also reverse the awards of attorney's fees."). We sustain the bank's sixth issue.

In its seventh issue, the bank contends the trial court erred by not awarding it its attorney's fees. In the guaranty agreements and the line-of-credit agreement, Ganter promised, in the event of his default, to pay the bank its costs of collection including attorney's fees. The bank asserts Ganter's liability for attorney's fees was initiated by his defaulting on the agreements. However, whether Ganter defaulted has not been finally determined. As discussed above, there is a genuine issue of material fact as to whether Ganter overpaid the bank. If he paid more than was due under the guaranties, then he did not default on the guaranty agreements. Likewise, if he paid more than was due under the guaranty agreements, then the bank had no right to draw on the line of credit, and Ganter did not default on that agreement either. Accordingly, we conclude the bank has not shown it proved its entitlement to recover its attorney's fees. We overrule the bank's seventh issue.

## OTHER ISSUES

Besides the issues discussed above, Ganter also brought two cross-issues concerning the trial court's interpretation of the ratification and release-of-lender provisions in the LMAs. Determination of those issues, which concern whether the release-of-lender provision in the LMAs provide that Ganter released any claims and defenses alleging payment of the guaranties before signing the LMAs and whether the ratification provisions in the LMAs reset his liability under the guaranties to their original amounts regardless of how much he had paid under the guaranties toward principal, do not affect the outcome of our determination that neither party established a right to summary judgment. Accordingly, we do not address them. *See* TEX. R. APP. P. 47.1.

## CONCLUSION

We reverse the trial court's judgment, and we remand the cause to the trial court for further proceedings consistent with this opinion.

210375f.p05

/Lana Myers//
LANA MYERS
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

INDEPENDENT BANK,
FORMERLY KNOWN AS UNITED
COMMUNITY BANK, N.A.,
Appellant/Cross-Appellee

No. 05-21-00375-CV     V.

JOHN C. GANTER, Appellee/Cross-
Appellant

On Appeal from the 298th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-12-13675.
Opinion delivered by Justice Myers.
Justices Carlyle and Goldstein
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and this cause is **REMANDED** to the trial court for further proceedings consistent with this opinion.

It is **ORDERED** that appellant/cross-appellee INDEPENDENT BANK, FORMERLY KNOWN AS UNITED COMMUNITY BANK, N.A. recover its costs of this appeal from appellee/cross-appellant JOHN C. GANTER.

Judgment entered this 29th day of December, 2022.